P. A. BLACKFORD, Executor, Plaintiff, Appellee, v. DORR ANDERSON et al., Appellants; LEE COUNTY et al., Defendants, Appellees.

No. 44550.

JUNE 20, 1939.

REHEARING DENIED DECEMBER 13, 1939.

J. R. Frailey, for plaintiff, appellee.

E. W. McManus, L. L. Orsborn, J. R. McManus, and M. H. Johnson, for appellants.

J. O. Boyd, D. J. McNamara, R. N. Johnson, and John F. Burrows, for appellees Board of Supervisors of Lee County and its members.

1140

Fred Everett, Attorney General, and T. J. Mahoney, Assistant Attorney General, for appellees Iowa State Highway Commission and its members.

Buss, J.—Alexander Coleman, a resident of Lee county, Iowa, died testate on December 17, 1933, leaving neither wife, nor direct heirs, surviving him. His testamentary papers consisted of a will and two codicils thereto. All of these were admitted to probate, without contest, on April 19, 1935, by the district court of Lee county. The plaintiff-appellee was appointed executor, and he qualified. By these testamentary documents, the testator provided for the payment of his just debts and funeral expenses, and bequeathed and devised the residuum of his estate to the improvement and hard surfacing of certain designated highways in the counties of Henry and Lee.

On April 20, 1935, Dorr Anderson, one of the appellants in this action, and a nephew of the testator, as a resident, citizen, and taxpayer of Lee county, on behalf of himself and other such residents, citizens, and taxpayers, filed a petition in equity in the district court of Lee county, against the board of supervisors of Lee county, and its members, praying that they be enjoined from accepting the bequest in the second codicil, and from permitting the executor to use it in the construction of a concrete paved highway in Lee county, as designated, and in the manner provided in said codicil. The grounds of the petition were that such conduct by the board would be a wrongful surrender of governmental functions. A temporary injunction was granted as prayed. Later, on his own application, and by amendment to the petition, Blackford was made a party defendant, individually, and as executor. It was the intention of the appellee board of supervisors to accept the bequest, and of both the board and the executor to carry out the provisions of the testamentary disposition, had it not been for the temporary injunction. That suit is also pending on appeal in this court, Anderson v. Board of Supervisors, 226 Iowa 1176, 286 N. W. 735.

After the filing of the injunction action, and on November 10, 1936, the executor filed his petition in the action at bar, asking for a construction of the will and codicils of the testator. He joined as defendants all interested parties—all of the collateral heirs of the testator, being children or grandchildren of his brothers and sisters, Lee county, its board of supervisors,

and the Iowa State Highway Commission and its members. In this action the plaintiff is seeking such a construction of the will as would permit the use of the residuary estate in the construction of the concrete paved highway as provided for in the second codicil. All of the defendants, other than the defendant heirs, joined the plaintiff in seeking this construction. The defendant heirs contend that the will and the first codicil were revoked by the second codicil, and that the latter is void, since, as they alleged, it requires the board, as a condition precedent to accepting the bequest, to delegate to the executor its governmental rights and duties, in the construction of the highway. They ask therefore that the second codicil, or the testator's last will and testament, as they term it, be declared invalid, and that the residuary assets of the testator's estate be distributed among them as intestate property, according to the laws of descent and distribution. The same contentions are made by the respective parties in the injunction suit. Both suits were brought at issue by proper pleadings. The two suits were not in fact consolidated, but by agreement they were tried together and submitted to the trial court on the pleadings, and on the same stipulation of facts. A single decree, covering both suits, was entered by the trial court against the heirs in each action. Separate appeals have been taken to this court in both suits, but parts of the written arguments in each are by reference made applicable to the other, and both were presented to the court together, in the oral submission. We will dispose of both appeals in this decision, and the determination of the appeal and the decision in Anderson v. Board of Supervisors, 226 Iowa 1176, 286 N. W. 735, will be ruled by the decision herein.

The town of Hillsboro is in the extreme south part of Henry county. The testator lived a short distance south of it in Lee county on what he describes as the "Old Coleman Homestead." The testator had never married, and left neither issue, nor parents, surviving him. He had accumulated a large amount of both personal and real property. In order that the reader may have an understanding of the matters which are determinative of the issues involved, it is necessary to set out, in large part, the will and codicils. He executed the will on November 20, 1923, and designated it as his last will and testament, revoking all wills, theretofore made. In it he first directed the payment of his debts and funeral expenses, as soon as practicable after

his death. In the fourth paragraph of the will he appointed Ira Anderson of Lee county and P. A. Blackford, of Henry county, as executors, and directed them to collect the assets of his estate and turn them as directed in the preceding paragraphs of the will. The second and third paragraphs of the will are as follows:

"1st. I direct that my funeral expenses and just debts be first paid as soon as practicable after my death.

"2nd. I give and bequeath to the County of Henry, State of Iowa, FORTY Thousand Dollars (40,000.00) to be used to build a hard surface road from the Mrs. Sadie T. Clawson-Mrs. Ed H. Lee corner in east Hillsboro, Iowa, from said corner south to the Lee County, Iowa line, said hard road to be of construction other than dirt, and to be constructed as soon as practicable after my death, and as soon as the funds are turned into the hands of said Henry County, Iowa, said road to be built under the supervision of the Board of Supervisors of Henry County, Iowa. The above sum to be expended on what is now known as the Blue Grass Road running south from Hillsboro, Iowa.

"3rd. All the balance of my estate after deducting Court costs, and cost of administration, I give to the County of Lee, State of Iowa, for the purpose of continuing the building of a hard surface road on the Blue Grass Road, said building of such road to begin at the Henry County, Iowa line of such Blue Grass road, and to be continued South and East on said Blue Grass road as far as the funds will build it. Said road to be of construction other than dirt road and to be built under the supervision of the Board of Supervisors of Lee County, Iowa."

On April 15, 1926, the testator executed a codicil to the will above set out. This codicil, in full, is as follows:

"CODICIL

"I, Alexander Coleman, of the town of Hillsboro, County of Henry and State of Iowa, being of sound and disposing mind do make, publish and declare this to be a codicil to my last Will and Testament, executed and signed by me on the 20th day of November, 1923, and it is my desire and intent that wheresoever there is any conflict between the said Last Will and Testament and this Codicil, that this Codicil shall prevail.

"Item 1. I direct that my just debts and funeral expenses be first paid out of my estate.

"Item 2. I desire to and do hereby create and establish a trust fund for the benefit more especially of the people of Lee and Henry Counties, Iowa, and for the public benefit, as it is my desire that my estate shall be used where it will do the most good to the most people. For that purpose, I devise and bequeath as such trust fund all the rest, residue and remainder of my estate, real, personal and mixed, of which I may die seized or possessed, or to which I may be entitled, unto P. A. Blackford, Wm. Thornton and J. R. Frailey, as trustees of said trust fund for the purpose of and to be used solely for the building and constructing of a hard surfaced road under the supervision and direction of the Boards of Supervisors of Lee and Henry Counties, Iowa, and the duly authorized highway engineering officers of Lee and Henry Counties and the State of Iowa, and in accordance with the plans and specifications of said highway engineering officers of the State of Iowa.

"Each Board of Supervisors and the highway engineering officers thereof in Lee and Henry Counties to have power to act hereunder only in their respective county. Any highway engineer of the State of Iowa appointed or delegated to act to carry out the provisions of this Will, shall have power to act hereunder in all matters in both Lee and Henry Counties, Iowa.

"Item 3. The said road so to be constructed by this trust fund shall be and is described as follows: (Here follows a specifically designated route over part of a highway, known as the "Blue Grass Road" in Henry and Lee Counties, "as it may be laid out at the time of the acceptance of this gift, to such a point on said Blue Grass Road as this gift will provide the necessary money to construct and pay for".)

"In order that there shall be a fair division of my estate as to the expenditures I desire in Lee and Henry Counties, I direct that after the net value of my estate has been determined by my executors and the total amount of this trust fund thus ascertained, that the State Highway Commission of the State of Iowa then determine: First the cost per mile for the paving construction in Henry County, and second, the cost per mile and the number of miles of paving construction in Lee County that can be built out of the remainder of my estate. Such estimate and determination by the State Highway Commission shall be binding and final on both counties and the officers thereof, and I further direct that no appeal shall be taken therefrom.

"Item 4. The gift and bequest herein made is contingent upon the following conditions:

"1. That the proper and lawful officials of Lee and Henry Counties shall by lawful proceedings, first, bring the surface of the road as above described, to proper grade and shall construct whatever bridges and culverts that shall be necessary, preliminary, to paving said road. The intent of this gift and bequest being that it shall be used for the purpose of constructing only that part of said road which shall consist of paving or pavement.

"2. It is my desire that the funds available from my estate shall be used to construct the paving or pavement, as hereinbefore described, in Henry County, Iowa, North of the County line between Lee County and Henry County up on said road, and that the remainder of the funds remaining in my estate shall be used to construct such paving or pavement in Lee County, Iowa, from the line between Lee and Henry Counties, south upon said road and thence along it as above described, to such a distance as the funds remaining available from my estate will warrant, permit and pay for.

"Item 5. I direct that the trustees herein named shall have the power to at any time sell any real estate, a part of my estate wherever situated, and to convert the same into cash for the purpose of carrying out the intent of this trust fund, and they are further authorized and empowered and directed to execute the necessary deeds to the purchaser or purchasers of the real estate without any futher or other proceedings in Court or otherwise.

"Item 6. I also declare and direct that all funds from my estate shall remain in the care and custody of the trustees hereinbefore named and shall be by them safely deposited and shall be paid out by them only at such times as the work of construction of said road progresses to the point where funds shall be necessary to pay for such construction under the terms and conditions of the contract or contracts for said work, and that it shall only be paid out by said trustees when requests for said payment shall be made upon them by either or both of the said Boards of Supervisors by legal resolution, setting out the necessity therefor, and that none of such funds shall be paid out for the purposes herein contemplated until the work and construction of said road as it progresses, has been approved by and accepted by the Boards of Supervisors of Lee and Henry Coun-

ties, Iowa, and the proper and legal highway engineering officers of either county, as the case may be, and the approval and acceptance of the highway engineers of the State of Iowa as to any and all parts of said project.

"Item 7. In the event of the acceptance of this gift and bequest by the proper and legal officers of Lee and Henry Counties, Iowa, I hereby authorize the Boards of Supervisors of each of said counties to advertise for bids and to contract for the construction of said road under the same terms and conditions of advertisement and contract as for the construction of like roads under the laws of the State of Iowa, and I further direct that the trustees herein named be consulted and conferred with before the acceptance of any bid or the letting of any contract for the construction of said work. And, that if in the judgment of said trustees the said bids are excessive, unreasonable or otherwise in any manner objectionable, or the terms and conditions of any proposed contract are to them objectionable, and an agreement as to said bids or contracts can not be arrived at as between the said trustees and either or both of the said Boards of Supervisors of Lee and Henry Counties, Iowa, that the matter shall then be submitted to a Judge of the District Court in and for Lee County, Iowa, if such disagreement arises in Lee County, and to a Judge of the District Court in and for Henry County, Iowa, if such disagreement arises in Henry County, for decision and determination and that in either case such decision by said Judge shall be final.

"Item 8. I also declare and direct that in case any difference of opinion shall at any time arise between the said trustees as to any matter arising in the execution or exercise of any trust, power or discretion under this, my will, the matter shall be submitted to a Judge of the District Court in and for either Lee or Henry County, Iowa, and that his decision therein shall be final.

"Item 9. In the event that for any reason whatsoever, a vacancy shall occur in the number of the trustees hereinbefore named and designated, I direct that the two remaining trustees shall act as such and continue to carry out the purposes of this trust, and in the event that thereafter a second vacancy occurs, then and in that event if such vacancy is the trustee of Lee County, Iowa, it shall be filled by appointment by a Judge of the District Court in and for Lee County, Iowa, and if such

1146

vacancy occurs in Henry County, Iowa, it shall be filled by appointment by a Judge of the District Court in and for Henry County, Iowa.

"Item 10. As compensation for their services as trustees, I direct that the said trustees shall receive an amount equal of five (5%) per cent of the total value of my estate, each trustee to receive as compensation one-third (1/3) of such percentage and amount. Each trustee shall give bond as such in an amount to be determined by a Judge of the District Court in and for Lee County, Iowa.

"Item 11. If either Lee or Henry County, Iowa, by and through their legally constituted officers, fail, neglect or refuse to accept by proper legal proceedings, the gift and bequest under the terms and conditions of this will within ninety (90) days . after it has been admitted to probate then and in that event all that portion of my estate bequeathed to the county so failing, neglecting or refusing to accept under the terms of this Will, shall divert to and be applied to the extension of the construction of the said Blue Grass Road in the county, either Lee or Henry, that does accept, to continue the construction of said road to a point beyond the terminal point of said road in such accepting county as hereinbefore directed as far as the amount of my entire estate will pay for and permit.

"Item 12. I devise and bequeath no property and I make no provisions in this, my Last Will and Testament and Codicil thereto for any and all of my relatives and heirs at law. Not that I have forgotten or overlooked any or all of them, but for the reason that it is my belief and conclusion that in their present financial circumstances and with the legacies that they have heretofore obtained from other sources, that they have been amply provided for and that for their own good and benefit, no bequests from me would be justified.

"Item 13. As the duty of carrying out the terms of this Last Will and Testament and Codicil thereto, have already been placed in the hands of P. A. Blackford, Wm. Thornton and J. R. Frailey, as trustees, I hereby further appoint the same, P. A. Blackford, Wm. Thornton, and J. R. Frailey, as executors of this, my Last Will and Testament and Codicil thereto and I direct that they shall have the power to at any time sell my real estate, as part of my estate, wherever situated, and to convert the same into cash for the purpose of carrying out the intent

of this trust fund and they are further authorized and empowered and directed to execute the necessary deeds to the purchaser or purchasers of the real estate without any further or other proceedings in Court or otherwise.''

Sometime after the execution of the codicil above set out, the testator, in cooperation with the board of supervisors of Lee county, Iowa, and the Iowa State Highway Commission, constructed ten and ninety-two hundredths (10.92) miles of paved road extending from the town of Hillsboro, in a southerly and easterly direction, to and connecting with United States and Iowa State Highway No. 161, (Now No. 218), which is a paved highway extending in a northerly and southerly direction across Lee county, near the center thereof.

On December 16, 1930, the testator executed what he denominated a second codicil to the foregoing will. This instrument, in full, is as follows:

### ''SECOND CODICIL

''I, Alexander Coleman of the Town of Hissboro, County of Henry, and State of Iowa, being of sound and disposing mind do make, publish and declare this to be a Second Codicil to my Last Will and Testament, the said Will being executed and signed by me on the 20th day of November, 1923, and the First said Codicil to said Will being executed and signed by me on the 15th day of April, 1926, and it is my desire and intent that wheresoever there is any conflict between the said Last Will and Testament and the said First Codicil to said Will and this Second Codicil, that this Second Codicil shall prevail, and I hereby declare all Wills and Codicils heretofore made by me revoked.

''My reason and intent for executing this Second Codicil to my Last Will and Testament and First Codicil to the said Will is as follows: In the said First Codicil to said Will I provided for the construction and building of a certain paved highway therein specifically described. Since said time the paved highway therein provided for has been constructed and completed insofar as a certain trust fund heretofore set aside by me would provide for said construction. Since the execution of the said First Codicil the State of Iowa has taken over as a primary road that part of the highway therein described where any funds bequeathed by me for such purpose would have been used for the continuance of road construction on said highway.

It is therefore my intent and desire in this Second Codicil to provide for the construction of a highway in Lee County, Iowa, hereinafter specifically described that does not at this time constitute a part of what is known as the primary road system of the State of Iowa, it being my intent that the funds hereinafter bequeathed by me herein shall be used on other and additional roads that will not be constructed with State funds and it is further my desire herein that the funds derived from my estate shall be used for the construction of a road as hereinafter set forth near and in the neighborhood of what is known as the "Old Coleman Homestead."

"Item 1.  I direct that my just debts and funeral expenses be first paid out of my estate.

"Item 2.  All the rest, residue and remainder of my estate, real, personal and mixed, wherever situated or located, I give, devise and bequeath to Lee County, Iowa, under the following terms and conditions.

"1.  That the said remainder of my estate shall be used for the construction of a concrete paved highway hereinafter specifically described, including all necessary grading, bridging, culverting and tiling except the cost of any additional right of way for said highway if such be necessary.

"The said highway that I desire so constructed with the funds herein bequeathed is as follows:

"Beginning at the Northwest Corner of Section 17 and the Northeast corner of Section 18 in Township 69 North, Range 7 West in Lee County, Iowa; then running South on the section line where the highway is now located between Section 18 and 17, 19 and 20, 30 and 29, and 31 and 32, in Township 69 North, Range 7 West; thence continuing South on said highway between Sections 6 and 5 in Township 68 North, Range 7 West, and thence continuing South on said highway for as great a distance as the funds bequeathed will permit, all in Lee County, Iowa. It is my intent herein that the construction of the said highway shall begin at the point first herein designated and then be continued directly South as above set forth insofar as the funds available for said highway, based upon the cost of said highway as hereinafter provided for, shall permit and if the cost of the said highway per mile is such that it cannot be continued as far as I have hereinabove outlined it, it shall cease at such point

as the funds available based upon the cost per mile shall necessitate.

"Item 3. I hereby appoint as the Executor of this Second Codicil, which I declare to be my Last Will and Testament, P. A. Blackford, of Hillsboro, Iowa, and direct him as such Executor to carry out the terms of this instrument as follows:

"1. I direct that the said P. A. Blackford shall have all of the rights and powers of an Executor as provided for by the laws of the State of Iowa, and I further direct that he shall have the power at any time to sell any and all real estate, a part of my estate, wherever situated and to convert the same into cash for the purpose of carrying out the intent of this Second Codicil and he is further authorized, empowered and directed to execute the necessary deeds to the purchaser or purchasers of the real estate constituting a part of my estate without any further or other proceedings in Court or otherwise.

"2. I direct that the construction of the highway herein provided for shall be under the supervision, authority and judgment of the said P. A. Blackford and he is hereby authorized and empowered to execute any and all legal instruments and to make all payments out of my estate that are necessary for the construction of the said highway and to receive bids and execute all contracts necessary in the furtherance of said construction. Provided however, that the said P .A. Blackford in carrying out my intent herein consult with the State Highway Commission of the State of Iowa and, as far as he thinks practicable, carry out the suggestions and any plans proposed by said State Highway Commission. It being my intent herein to vest in the said P. A. Blackford the same full powers to act in said construction as I could have acted myself.

"3. In the event that the Board of Supervisors of Lee County, Iowa, accept the provisions of this my Last Will and Testament, it shall be upon the following conditions.

"1. That if any additional right of way for said highway is necessary that the said additional right of way shall either be donated by the abutting property owners or purchased by the Board of Supervisors of Lee County, Iowa.

"2. That the said P. A. Blackford shall have full power and authority, without the cooperation of the said Board of Supervisors, to have prepared all plans and specifications for said highway and to receive and act upon all bids for the con-

struction thereof and to execute all contracts and make all expenditures that may be necessary for said construction.

"3. That the Board of Supervisors in Lee County, Iowa, shall provide free of any expense to the bequest herein made or to my estate the services of the County Engineer or some other competent Engineer approved by the said P. A. Blackford for the construction of said highway.

"Item 4. I hereby direct that as compensation for the said P. A. Blackford, as Executor of this my last Will and Testament and Codicils thereto that he shall receive the regular statutory fee provided for Executors in the State of Iowa and that in addition thereto he shall receive the sum of $2,000.00 as compensation for the services rendered by him under the terms and conditions of this my Last Will and Testament and Codicils thereto and that he shall give a bond as such Executor in some surety company to be approved by the District Court of the State of Iowa. I further direct that all necessary expenses to which the said P. A. Blackford is put as said Executor, shall be paid out of my estate."

The will and each codicil were all duly and lawfully executed, published, declared, and witnessed, and no question is raised as to any of these matters. They were attached to the petition and admitted in evidence as a part of the stipulation of facts. As stated by the testator therein, the execution of the second codicil was made necessary because the highway improvements designated in the will and first codicil, to the extent of almost eleven miles, had been constructed with his funds, and by his cooperation with the proper county and state highway officials, and the remainder of that projected road had been taken over as a primary road by the State of Iowa.

At his death in 1933, the testator left an estate of the approximate value of one hundred thousand dollars ($100,000.00).

■ I. The appellants claim, and argue at length, that the codicil of 1930 is, in itself, the last will and testament of the testator, and that it expressly revoked the will of 1923 and the codicil of 1926, and that neither instrument is of any force nor effect. It is the contention of all of the appellees that neither the will nor the first codicil has been wholly revoked, but that the three instruments stand together, and the testamentary disposition of the testator should be determined from the combined

instruments. It is our judgment that the latter contention is the correct one, although it appears to us that the decree of the trial court must be sustained under either contention.

The appellants select from the second codicil certain isolated clauses, and urge that these clearly and definitely show that the testator intended to, and did, revoke both his will and the first codicil thereto. The matter of revocation is one of intent. More correctly speaking it is a combination of an intent to revoke and an overt act. And like the animus testandi, the animus revocandi, or intention to revoke, must be gathered and determined from the four corners of the testamentary papers, aided in proper cases, by pertinent attending circumstances. These instruments are ordinarily their best interpreters. Let us look at the language of the second codicil. In the first paragraph of the preamble the testator states:

"I * * * do make, publish and declare this to be a *Second Codicil to my Last Will and Testament,* the said Will being executed and signed by me on the *20th day of November, 1923,* and the First said Codicil to said Will being executed and signed by me on the 15th day of April, 1926, *and it is my desire and intent that wheresoever there is any conflict between the said Last Will and Testament and the said First Codicil, that this Second Codicil shall prevail,* and I hereby declare all Wills and Codicils heretofore made by me revoked."

A codicil, in its ordinary, and also its legal, application, is an addition to or modification of some existing testamentary paper. Oftentimes this testamentary paper is not described in the codicil, but, in this case, the testator definitely identifies his last will and testament, by giving the date of its execution. He further identifies it by giving the date of the first codicil thereto. He clearly identifies each of the earlier instruments, and then expressly makes the third instrument and codicil to them, a part of them. In the language of this court, the second codicil became "welded in the will" and first codicil, and "an integral part thereof", and "the will and the codicils are to be read together as one instrument." In re Estate of Thomas, 220 Iowa 50, 54, 261 N. W. 622, 624; In re Estate of Flannery, 221 Iowa 265, 271, 264 N. W. 68; Bennett v. Primer, 191 Iowa 1233, 184 N. W. 392.

Whether the thought is expressed or not in the codicil, it

is a general principle of testamentary construction that a codicil displaces a prior testamentary paper or part thereof, only insofar as it is clearly inconsistent therewith. Here the testator, by express words, definitely limits the displacement of the will and first codicil, to such parts, only, as conflict with the second codicil. The very kernel of his intention is expressed in those words. As stated by Justice Hamilton in In re Estate of Flannery, supra [221 Iowa 265, 271, 264 N. W. 71] :

"A will and codicil should be construed together as parts of one and the same instrument, and unless there is an irreconcilable conflict or discrepancy between them, the codicil is no more the last expression of testator's intention than if it had been written as a part of the original instrument. * * * Another way of stating the rule in this regard is that the language of a codicil will be permitted to disturb the provisions of the will only to the extent necessary to give effect to the codicil. The codicil supplants the will only to the extent of those provisions of the will that are inconsistent with it."

While this language was used with respect to the intention of a testator in a matter of testamentary disposition, it is equally applicable to testamentary revocation. It is expressed in 68 Corpus Juris 812, thus:

"As in other cases of testamentary construction, the intention of the testator is the test in determining how far the revocation of a will is affected by a codicil and such intention should be given its proper effect, neither enlarged nor restricted."

The plain import of the testator's language unmistakably shows his intention to be that the three documents should stand as the final testamentary disposition of his property. Otherwise, why did he refer to the second paper as the "First Codicil to my Last Will and Testament", and to the third paper, as a "Second Codicil to my Last Will and Testament?"

Appellants lay especial stress upon the last clause of the first paragraph: "and I hereby declare all Wills and Codicils heretofore made by me revoked." Such or similar words, as a precaution, are ordinarily inserted in all wills. They have become so much a matter of form that a like clause is uniformly found in printed blank wills. They are meant to apply to wills or testamentary papers other than the one being executed, or the

one being amended or altered. Such was the plain intention of the testator in this case. He had just stated that the instrument he was preparing was a codicil to, and amendment of, his "Last Will and Testament". It would be a gross perversion of his intention to say that, by that last clause, he meant to revoke the very will and first codicil which he was republishing and amending, and to further say that those instruments which he had just declared were to be supplanted only insofar as they conflicted with the second codicil, should be revoked and displaced in toto. The courts must not permit the solemn declarations and intentions of a testator to be so airily brushed aside by equivocal expressions clearly in conflict with the intention of the testator as evidenced by the whole instrument.

Appellants also refer to Item 3, and to paragraph 3 of Item 3, wherein the testator refers to the second codicil as "his Last Will and Testament." These words must be interpreted and construed in the light of the testator's intention as gathered from the second codicil, and from the will and the first codicil. The paramount intention of the testator as disclosed therein cannot be overridden by equivocal statements which would destroy that intention. Later in the codicil, and in Item 4 thereof, is language directly contrary to the words referred to by appellants in Item 3. In Item 4, the testator states:

"I hereby direct that as compensation for the said P. A. Blackford, as Executor *of this my Last Will and Testament and Codicils thereto* that he shall receive the regular statutory fee provided for executors in the State of Iowa and that in addition thereto he shall receive the sum of $2,000.00 as compensation for the services rendered by him under the terms and conditions *of this my Last Will and Testament and Codicils thereto* * * *." (The italics are ours).

These last statements clearly establish that the quoted words in Item 3 and paragraph 3 thereof were inadvertent and should be disregarded. And if they were not inadvertent they cannot be said to be controlling. "It is well settled that the statement in the later testamentary document that it is the last will and testament of the testator has of itself no revocatory force or effect." In re Molson, 21 Ont. Law Rep. 289, 18 Ann. Cas. 279; Birks v. Birks, 34 L. J. P. 90 (Eng.); In re Venable's Will, 127 N. C. 344, 346, 37 S. E. 465; Note in 28 Am. St. Rep. 353; 28

R. C. L. Sect. 130; Underhill, Law of Wills, Sect. 251; Williams v. Miles, 68 Neb. 463, 94 N. W. 705, 96 N. W. 151, 62 L. R. A. 383, 110 Am. St. Rep. 431, 4 Ann. Cas. 306; Flinn v. Frank, 8 Del. Ch. 186, 68 A. 196; 1 Jarman on Wills, 5th Am. Ed. 339; 68 Corpus Juris 491. In Fry v. Fry, 125 Iowa 424, 427, 101 N. W. 144, 145, this court said:

"Whether revoked in whole or in part must depend upon the testator's act and intent as gathered from the instrument of revocation itself. That the testator did not intend to revoke all the provisions of his former will is manifest from the face of the instrument itself. True, he states in this last paper that he makes, publishes, and declares it to be his 'last will and testament' but this is not controlling, and should not be held to revoke his former will, if it is manifest that he did not so intend it. Gordon v. Whitlock, 92 Va. 723 (24 S. E. Rep. 342). If this last instrument had been denominated a codicil, as it in effect was, there would be no difficulty with this aspect of the case. But it is the right as well as the duty of the court to arrive at the testator's intent in this regard, and if the two wills, taken together, will prevent partial intestacy, they will be construed as one, in so far as this may reasonably be done."

If we were to follow the contention of the appellants in this case, it would result in the entire residuary estate being intestate property. We have no hesitancy in holding that the second codicil did not expressly revoke the last will and testament and the first codicil thereto, but that the three instruments stand, as probated, as the final testamentary disposition of the testator.

II. Appellants insist that the will and the first codicil were revoked in their entirety by the second codicil, both expressly and impliedly. In view of our conclusion that there has been no such express revocation of these two instruments as a whole, it remains to determine the extent and effect of any partial revocations. Such parts of the will and the first codicil as are revoked by the second codicil are implied revocations, and they arise solely because they conflict and are inconsistent with provisions of the second codicil. Where such conflict exists, the provisions of the second codicil are to prevail. The provisions of the second codicil which have caused the controversy between the appellees and the appellants, both in this suit to construe

the will, and in the injunction suit, are in Item 3 thereof, and are as follows:

"*I direct that the construction of the highway herein provided for shall be under the supervision, authority and judgment of the said P. A. Blackford and he is hereby authorized and empowered to execute any and all legal instruments and to make all payments out of my estate that are necessary for the construction of the said highway and to receive bids and execute all contracts necessary in the furtherance of said construction.* Provided however, that the said P. A. Blackford in carrying out my intent herein consult with the State Highway Commission of the State of Iowa and, as far as he thinks practicable, carry out the suggestions and any plans proposed by said State Highway Commission. It being my intent herein to vest in the said P. A. Blackford the same full powers to act in said construction as I could have acted myself.

"3. In the event that the Board of Supervisors of Lee County, Iowa, accept the provisions of this my Last Will and Testament, it shall be upon the following conditions.

"1. That if any additional right of way for said highway is necessary that the said additional right of way shall either be donated by the abutting property owners or purchased by the Board of Supervisors of Lee County, Iowa.

"2. *That the said P. A. Blackford shall have full power and authority, without the cooperation of the said Board of Supervisors, to have prepared all plans and specifications for said highway and to receive and act upon all bids for the construction thereof and to execute all contracts and make all expenditures that may be necessary for said construction.*

"3. That the Board of Supervisors in Lee County, Iowa, shall provide free of any expense to the bequest herein made or to my estate the services of the County Engineer or some other competent Engineer approved by the said P. A. Blackford for the construction of said highway." (The italics are ours.)

The parts thereof which the appellants insist invalidate the bequest to Lee county and cause the property bequeathed to become intestate property are the italicized portions of the provisions. They urge upon us that for Lee county to accept the bequest, upon the conditions designated, would be a surrender upon the part of itself and its board of supervisors of their

governmental duties, obligations, and functions with respect to their jurisdiction and control over a portion of the public highways of Lee county, and the improvement thereof, and an unlawful delegation thereof to P. A. Blackford, a private citizen. They further insist that since the foregoing italicized provisions conflict with the provisions of the will, which made an outright bequest to Lee county, with direction that the road be improved under the supervision of the board of supervisors of Lee county, and that since said provisions conflict with the first codicil, wherein the residuary estate was given in trust to named trustees to be used in improving the highway under the supervision of said board of supervisors and the State Highway Commission, the provisions in the second codicil must prevail, and, by prevailing, invalidate said codicil, because of the illegality of the provisions.

The answer of the appellees to this contention is, that since the testator intended to make a valid disposition of his property, and to in no wise violate any law or rule of public policy, and to make an effective testamentary disposition of his property, the fact that he failed, because of a mistake of fact, or of law, or for any other cause, to make an effective bequest or devise of his property in his second codicil, and inserted an invalid provision, also renders such invalid provision inoperative as a revocation of the provisions with which it conflicts in the first codicil. This principle of the law of wills, upon which the appellees rely, has been designated by the rather nonenlightening label of the "doctrine of dependent relative revocation." While the principle has been applied since the days of Roman jurisprudence and by the English and American courts, the blame for its name has been placed upon J. J. Powell. (Prof. Joseph Warren [1920] 33 Harvard Law Rev. 337). In his work on Devises, the first text book on wills, published in 1788, the author thus speaks of it:

"This principle, that the effect of the obliteration, cancelling, etc. depends upon the mind with which it is done, having been pursued in all its consequences, has introduced another distinction not yet taken notice of; namely, that of dependent relative revocations, in which the act of cancelling, etc. being done with reference to another act meant to be an effectual dis-

position, will be a revocation or not, according as the relative act is efficacious or not."

In its earlier application, as noted in the quotation, it was confined to revocations effected by some physical act upon the document itself, such as cancellation, obliteration, destruction, or like means. The reason being that such acts may be equivocal, since they may occur inadvertently, or unintentionally, and ought to be subject to explanation. But since there is no difference in principle between a revocation effected by a physical act deliberately done, and a revocation effected by a later document, the application of the doctrine has been extended to purported revocations of earlier wills, wholly or partially, by later written documents. In a number of the earlier decisions a distinction has been made between those instances in which the later instrument was ineffective in its disposition because of defective execution, and those instances where the later will was inoperative because of the incapacity of the taker, or the lack of power or authority in the testator, or for other reasons "dehors" the will (outside of, unconnected with), as the pedant puts it. On logical reason, sound principles, and the weight of authority, it is our judgment that there is no justification for these alleged distinctions. The basis for the doctrine of dependent relative revocation, or conditional or mistaken revocation, as it is sometimes called, is that there was never any revocation of the earlier instrument, or real intention to revoke, because of a mental misconception of the effect of his act, on account of mistake, or ignorance, or some other error.

In a wide research we have found no decision or authority presenting any sound reason for the distinctions above referred to. Other courts have had like difficulty. We refer to an English and an American opinion. In Tupper v. Tupper, 1 Kay and Johnson's Reports 665, Vice-Chancellor Sir W. Page Wood said:

"I concede it is very difficult to make a satisfactory distinction between Onions v. Tyrer (1 Peere Williams' Reports 343, where the second will was inoperative for defective execution) and those cases in which the gift fails for want of capacity in the devisee to take."

In a Massachusetts case, Laughton v. Atkins, 18 Mass. (1 Pick.) 535, 546, the eminent Chief Justice Parker said:

"It must be confessed that it is not easy to perceive any reason for the distinction formed by these two classes of cases [where the will fails for want of due execution and where it fails dehors], as far as they relate to the intention of the testator, for in the latter, as well as former, he manifests an intent not to die intestate."

The foundation of the doctrine of dependent relative revocation is a desire to carry out the intention of the testator, where the later disposition would unintentionally thwart it. It has been so applied from its inception. In Ecclestone v. Petty, alias Speke, 4 Carthew 79 (1689), the testatrix devised lands by two wills. The second was inoperative because not properly attested. The heir contended that although the second will was void, it revoked the first will. The court stated that it was obvious that this would defeat the intention of the testatrix, and refused to revoke the first will.

A leading case on the subject, and one referred to in many cases, and in every discussion, is Onions v. Tyrer, supra, (1716), argued and determined in the High Court of Chancery. In that case the testator executed two wills devising property to the same uses in each, but to different trustees. The second will was of no effect because not properly attested. Thinking the second will valid, the testator expressly revoked the first will. The heirs claimed that the second will, though without dispositive effect, revoked the first will. Lord Chancellor Cowper referring to the same disposition in each will, said: "And therefore it may be truly said, that the second will did not intend to revoke the former, *but rather to confirm it.*" (Italics are ours.) The able barrister-reporter in commenting on the Lord Chancellor's discussion of the case said:

"And it would be unreasonable and contrary to natural justice, that the testator, who by his second will has shewn his intention to dispose the same lands to the same purposes as in his former, and thereby in effect made the same devise twice, should by that means be wholly defeated of having his meaning take effect by either of them; and that therefore if the first will was cancelled as the law requires, it is one of those accidents against which this court ought to relieve. And upon the whole matter his lordship declared the trust of the term in the first will, ought to be executed."

These two ancient but inherently sound opinions, and particularly the latter, are almost on ''all fours'' with the case before us. In each of those cases the testator twice devised the property to the same use. Here the testator showed his fixed intention that Lee county should have his property to improve designated highways, by three times, in a period of seven years, so devising it, with no particular change except in the elimination of two of the three trustees in the second codicil. In the words of Chancellor Cowper, he definitely showed his intention to confirm rather than to revoke. If the testatrix, as the court stated in the Ecclestone case, did not desire to die intestate, certainly the intentions of the testator were clearly made known when he used one paragraph of the first codicil to explain why he left nothing to the appellants.

The courts have made no distinction between mistakes of fact and mistakes of law in applying this doctrine. It is a doctrine of presumed intention, which has been given effect by the courts in their constant effort to ascertain the real intention of the testator. The theory being that the change in the old will and the revocation thereof would not have been made unless effect could be given to the new will. The revocation is considered as having been made on the mistaken belief in some fact, and the courts hold that it is immaterial that the mistake be one of fact or of law. While there are cases holding that the doctrine should not be given effect where there is an express revocation, the better opinion is that the doctrine still applies, since it will be inferred that the earlier will was revoked only to give effect to the later one, and if, for any cause, the later will is inoperative, the earlier will will take effect. 28 R. C. L.; 62 A. L. R. 1401 et seq.; 6 L. R. A., N. S., 1109; L. R. A. 1916 C, 92. To this point Justice Neville, in In re Bernard's Settlement (1916), 114 Law Times Rep. 654, said:

''It does not seem to me that the real point is determined by the question of whether there are words of direct revocation or whether such words are absent. It seems to me that it would be far too narrow a view to apply any such rule in construing documents of this kind, because whether you have a gift in lieu of a previous appointment, either by necessary implication or by direct words, you must revoke the original appointment if you are to give effect to the second; and, therefore,

whether the testator says in so many words 'I do revoke', or whether he uses words which necessarily involve revocation, the result is the same, and that it would not be a wise distinction to make, except in so far as direct words may be some guide to what the intention of the testator was. I think the question which the court has to determine is: By the second appointment did the testator intend in any case to revoke the prior appointment or did he really only intend to revoke the prior appointment for the purpose of carrying out the alteration which he had made in his disposition, and (although probably it had not occurred to his mind) without having any intention of revoking the previous gift except for the purpose of the altered appointment.''

In the above case the testatrix did not change the beneficiary in the second will, but altered the manner of the devolution of the bequest so as to violate the rule against perpetuities. The court held that though this provision of the second will was void, it did not revoke the bequest in the earlier will. What Justice Neville said applies to the case at bar. Although the new appointment of Blackford, under the conditions stated, may be void, it does not revoke the bequest to Lee county, nor the provisions as to the administration of the trust, and the supervision and control of the highway improvement as provided in the first codicil.

No one can read the record in this case and have the slightest doubt as to what was the dominant purpose in the mind of Alexander Coleman. He had spent most of his life in the dirt road era. He knew its disadvantages and inconveniences. In the later years of his life he knew and appreciated the great benefits of hard-surfaced, all-season roads. He no doubt had given it much thought. He desired to do something to alleviate the hardships of his neighbors and those to come after them, and for the public generally, because of bad roads. He wished to devote his property accumulations to that end. The first expression of his benevolent desire was the will of 1923. That he had given it much thought thereafter is evidenced by the first codicil, executed in 1926. In Item 2 thereof he gave further expression to the charity which he was contemplating, in these words:

"I desire to and do hereby create and establish a trust

fund for the benefit more especially of the people of Lee and Henry Counties, Iowa, and for the public benefit, as it is my desire that my estate shall be so used where it will do the most good to the most people."

That he should die intestate, or that his heirs should receive his estate was farthest from his mind. The best evidence of that fact is Item 12 of the first codicil:

"Item 12. I devise and bequeath no property and I make no provisions in this, my Last Will and Testament and Codicil thereto for any and all of my relatives and heirs at law. Not that I have forgotten or overlooked any or all of them, but for the reason that it is my belief and conclusion that in their present financial circumstances and with the legacies that they have heretofore obtained from other sources, that they have been amply provided for and that for their own good and benefit, no bequests from me would be justified."

So deepset was his intention and so desirous was he to hasten its culmination that he furnished the funds for, and cooperated with the county and state highway officials in constructing almost eleven miles of hard-surfaced highway.

We need not speculate as to his reasons for the execution of the second codicil. He has stated them in the second paragraph of the preamble in that paper, as follows:

"My reason and intent for executing this Second Codicil to my Last Will and Testament and First Codicil to the said Will is as follows: In the said First Codicil to said Will I provided for the construction and building of a certain paved highway therein specifically described. Since said time the paved highway therein provided for has been constructed and completed insofar as a certain trust fund heretofore set aside by me would provide for said construction. Since the execution of the said First Codicil the State of Iowa has taken over as a primary road that part of the highway therein described where any funds bequeathed by me for such purpose would have been used for the continuance of road construction on said highway. It is therefore my intent and desire in this Second Codicil to provide for the construction of a highway in Lee County, Iowa, hereinafter specifically described that does not at this time constitute a part of what is known as the primary road

system of the State of Iowa, it being my intent that the funds hereinafter bequeathed by me herein shall be used on other and additional roads that will not be constructed with State funds and it is further my desire herein that the funds derived from my estate shall be used for the construction of a road as hereinafter set forth near and in the neighborhood of what is known as the 'Old Coleman Homestead.' "

He had not deviated in the slightest from his original intention and paramount purpose as expressed in the will of 1923. What he was chiefly concerned in was the accomplishment of this beneficence, and not who should administer it. He was concerned in having a road built, and not who should build it. Whether P. A. Blackford, Wm. Thornton, or J. R. Frailey or anyone of them should supervise the work was but an incident in the accomplishment of his cherished purpose. He, himself, had cooperated with the highway officials in the construction of eleven miles of highway. We have a right to assume that this construction work was done in accordance with the demands of the law and of the proper officers. He had done it and he apparently saw no reason why Blackford could not do the same. He expected him to do the same, for he stated in Item 3 of the second codicil:

"It being my intent herein to vest in the said P. A. Blackford the same full powers to act in said construction as I could have acted myself."

If the testator believed that Blackford might lawfully assume or usurp the road control and supervisory powers of the board of supervisors or the Highway Commission, he was mistaken in that belief. Appellants concede that he was mistaken and that his direction to Blackford was given under such mistaken belief. In their argument they state:

"Coleman, by his will, could not vest Blackford, his executor, with powers that Coleman could not have exercised in his lifetime. * * * Alexander Coleman apparently had a mistaken notion as to what could legally be done. * * * Apparently he thought this could be legally done."

As stated by Chief Justice Rugg, of the Massachusetts court, in Sanderson v. Norcross, 242 Mass. 43, 136 N. E. 170, 171:

"Revocation in its last analysis is a question of intent. A revocation grounded on supposed facts, which turn out not to exist, falls when the foundation falls."

And as stated by the Oregon court, in In re Dougan's Estate, 152 Or. 235, 53 Pac. 2d 511, 524:

"The doctrine of dependent relative revocation is largely based on presumed intentions. In an endeavor to give effect to the deceased's intent, the doctrine construes his mistaken belief into a conditional revocation."

Courts give effect to the doctrine when there is no reason to suppose that he would have made the change, if he had been aware that it would be wholly futile, but that his wishes with respect to his property, as expressed in his earlier testaments, would have remained unchanged. Coleman enlarged the powers of administration which he had given to his trustees in the first codicil, in his direction to Blackford, in the second codicil. It is reasonable to suppose that he did not know that the change would endanger or defeat his paramount purpose. Otherwise it is unlikely he would have made it. Of a similar situation the Connecticut court said, in John H. Strong's Appeal, 79 Conn. 123, 63 A. 1089, 1090, 6 L. R. A., N. S., 1107, 118 Am. St. Rep. 138:

"These [testamentary dispositions covering the same ground in a different manner] were treated as destroyed simply because they had been replaced by something else. Here she was acting under a mistake, and one apparent from the words used to effect the cancellation. This mistake was plainly the sole cause for the revocation which she intended to declare. Unless she exercised the power of disposition given her by Mr. Harris [her testator], the fund which was subject to it would go to strangers to her blood. * * * The case, therefore, is within the reason of the rule that a writing purporting to revoke a will on account of the existence of a certain fact, does not revoke it if there be no such fact. * * * It is true that the mistake is, at bottom, one of law. Miss Strong supposed that her unsigned and unattested will would have full effect upon her decease. In law it had no effect. But as respects a question of this nature, it is immaterial whether the mistake under which the act of revocation was done, was one of fact or law. The act

was nothing, unless done with the intent of revocation. If the intent to revoke was, as in this case, clearly dependent on a reliance upon a certain legal consequence attributed to certain circumstances, an error in attributing that effect to them is as effectual a bar to an actual revocation as if it were a pure error of fact.''

In Security Company v. Snow, 70 Conn. 288, 39 A. 153, 155, 66 Am. St. Rep. 107, the same court, spoke through the distinguished jurist, Justice Simeon E. Baldwin, with regard to a situation, where the testator in a codicil expressly revoked a provision in the will for the benefit of his daughter. The change in the codicil was void as contravening the rule against perpetuities. In holding that the invalid provision did not revoke the bequest in the will, the court said:

"But it is apparent that this was done not to diminish her equal share in the estate, but to transfer it to a trustee so as to secure it more effectually for her benefit. * * * It being his manifest intention to revoke the provision in the will only for this purpose, so far as the purpose fails of effect, the revocation must fall with it. * * * It was no part of this that he should die intestate in respect to the third of his residuary estate with which alone he was dealing. The revocation of his former provision for Mrs. Burrill was indissolubly coupled with the creation of the substituted provision. It may be given effect, so far as the substitution is valid, but no farther, because so only can the plain purpose of the testator be attained, and the mutual dependence of the two articles of the codicil be preserved. The whole instrument was a single testamentary act, and must be read as if the testator had expressly declared that he revoked the gift made to Alice [Mrs. Burrill] in his will simply to put it in a different form. Rudy v. Ulrich, 69 Pa. St. 177, 183, [8 Am. Rep. 238]. * * * The rule of construction upon which we proceed is analogous to that governing a revocation which is grounded on a state of facts which proves not to exist. It falls when its foundation falls.''

The case before us is still stronger than the above case, since here there was no express revocation. He did not change his purpose but simply changed a minor incidental in effectuating it. As stated in In re Raisbeck, 52 Misc. 279, 102

N. Y. S. 967, the inconsequence or the immateriality of the change as compared with the importance of those that were to stand, or the fact that the change was definitely contrary to the paramount purpose of the testator, or would defeat it, are all weighty considerations to show that no revocation was intended.

A leading case on the question involved herein, and one often cited and quoted in similar cases, is Austin v. Oakes, 117 N. Y. 577, 23 N. E. 193, 196. The void provision in the codicil was repugnant to a bequest in the will of the testatrix, and also to a power in her testator's will. By that will she was empowered to use her discretion, within specified limits, in disposing of certain property among her children. One of them died and by her codicil she gave his share to his sister's children. Such disposition was void because beyond the power of her appointment in her testator's will. It was therefore inoperative because of incapacity of the legatees. The defect was "dehors" the codicil. Nevertheless the court held that it did not revoke the provision in her will, as insisted upon in the court below. The court said:

"That proposition strikes me as both unreasonable and illogical. The appellant is required to argue, as he does argue, that the appointment of Mrs. Austin's codicil was absolutely null and void, because it transcended the authority conferred, and not only that, but was so vicious and bad that it dragged down with it the other appointments, which did not exceed the power, and yet was good enough, and had force enough, to revoke and annul, without words of revocation, an appointment complete and lawful, and fully within the scope of the power conferred. There is said to be authority for that doctrine; but, if there is, we should hope for the needed courage to dissent from its determination, for it will not bear the scrutiny of common sense, or harmonize with the plainest dictates of justice. I think a very brief analysis will show that I do not speak too strongly.

"What, then, is the ground of the alleged revocation? There are no words to that purport, or which declare that intention; and so it rests alone upon an implication born of the alleged repugnancy of the two provisions. But are they necessarily repugnant? They would be if the devise to the Oakes

children was good; but are they if it is bad? Can nothing be repugnant to something, and turn that something into nothing? Suppose Mrs. Austin had written out in full the thought which was in her mind when she executed the codicil. She would have said: 'I prefer to give the share of Charles to the Oakes children, if I can. That is my preference; and I give it to them, if I may do so according to law.' And then suppose that it should turn out that she could not lawfully make the change. Does it follow, in that event, that she meant to revoke the valid appointment? It seems to me that the implied revocation is wholly conditional, and the condition has failed. The provision was rather a preference than a revocation. Certainly, we must infer that she preferred to give the share to the Oakes children instead of her own, if she could; but as certainly we have no right to infer that, if she could not, she still meant to deprive her own children of what she had given them in the proportions assigned. There is no warrant for that. There is no word in the will and no fact in the case to charge her with an intention to withdraw her devise over to her children in the emergency that she could not gratify her preference for the children of her daughter. A revocation of an earlier disposition of a will by a later one, or by a codicil, on the ground of repugnancy, is never anything but a rule of necessity, and operates only so far as is requisite to give the later provision effect. We have said that in distinct and unqualified terms. Pierpont v. Patrick, 53; N. Y. [591] 595. But no revocation could give effect to this codicil.

"We have said, again, that where provisions are repugnant it is our duty to preserve the paramount intention of the testator, at the expense, even, of some subordinate particulars. Taggart v. Murray, 53 N. Y. 233. There is no possibility of mistaking what that paramount purpose of Mrs. Austin was. Most of all, she desired to execute the power of appointment with which she was intrusted and distribute the estate in accordance with that authority. She did so by her will, but in the end preferred to give a reversion to the Oakes children, if she lawfully might. That preference was wholly subordinate to the execution of her power, and no violence is done to her intention if, that failing, the disposition of her will is suffered to stand; for I deem it beyond a reasonable doubt that if she had known what we now know, that an appointment to the daughter's

children was not within her authority, she never would have made it, but would have suffered the disposition of her will to remain.''

The decision was followed in Altrock v. Vandenburgh, Sup., 25 N. Y. S. 851, 852, wherein the court said:

''Now, if this attempted devise was valid, it would operate as a revocation of the will in such respect, because inconsistent with it, and expressly intended to take the place of it. But it is not valid, and it would be strange, indeed, if a wholly inoperative attempted disposition should nevertheless have the effect of destroying a prior valid devise, especially when, as in this case, it is apparent that the testator did not wish to die intestate as to his real estate, and that, if he had known he could not lawfully make the disposition last attempted, he would have been content with the first. No authority has been brought to my notice which seems to require such a holding.''

In that case, as in the case before us, the revocation was not express, but implied from repugnancy. As we have noted, many cases, for sound reasons, hold that this is not a material distinction.

The Kentucky court, in United States Fidelity & Guaranty Co. v. Douglas, Trustee, 134 Ky. 374, 120 S. W. 328, 334, 20 Ann. Cas. 993, a case in which there was no express revocation, citing with approval the New York cases, above referred to, said:

''The principle announced in these cases from which we have quoted is sound, and, we believe, a correct enunciation of the rule. In Page on Wills, Sec. 263, it is held that, where a codicil is not so executed as to give effect to its provisions, it is treated as entirely void; that, even though it contains a clause of revocation, it is likewise void. Of course, if it is void because not executed in the manner and form as provided by law, it could not properly have any binding effect, and could not invalidate the provision of a previous will in conflict with its terms. By analogy of reasoning, if the codicil was void because violative of the plain provision of the law, we are unable to see how it could have any more effect upon the provisions of a previous valid will than it would have if void for other reasons. Being void, it is a nullity, and must be treated as

though it had never been executed. Hence, the contention of appellees that the execution of this void codicil revoked the provisions of the former will in which the testator disposed of the residue of his estate cannot be accepted as sound.''

In Ewell v. Sneed, 136 Tenn. 602, 191 S. W. 131, 137, 5 A. L. R. 303, the testatrix, by her will, had made her uncle the residuary legatee of most of her estate. By a codicil she gave it to him for life, with remainder to a trustee to be appointed by a Synod for a charitable use. This bequest was void because, prior to her death, the Synod was abolished. There was no express revocation. In holding against her heirs on their claim of implied revocation the court said:

''It appears in this case that Miss Ewell was more devoted to her uncle, Robert H. Shepherd, than to any one else. * * * It is obvious, therefore, that she would not have revoked her will in favor of her uncle had she not supposed that the codicil in favor of young ministers was valid. The revocation of the original will depended upon the efficacy of the codicil, as is clearly apparent from this record. The testatrix did not intend to deprive her uncle of anything or cut down the estate given him in favor of her heirs or distributees. Under our cases we are accordingly satisfied that this codicil does not operate as a revocation of the will. The will, therefore, not having been revoked by the codicil, and the codicil failing, the estate passed under the residuary clause of the will. * * * If, however, it be conceded that this codicil was intended as a revocation of the will, nevertheless such revocation was conditional and the case is controlled by Stover v. Kendall, 1 Coldwell (41 Tenn.) [557] 561, and Cowan v. Walker, 117 Tenn. 135, 96 S. W. 967.'' The latter case holds that the operation of the rule is not confined to cases of cancellation.

In In re Marx's Estate, 174 Cal. 762, 164 P. 640, 641, L. R. A. 1917F, 234, the testator's will of 1913 was probated. Later a will made in 1910 was found and probated. There was no statutory revocation clause in the last will. In it the bequests to charity exceeded the one-third value of the estate and were thus invalid as to the excess. This excess was used in paying bequests of the 1910 will. In holding against the heir who claimed it. The court said:

"The case is analogous to those where a testator, having made a will and desiring to make a new one, cancels the first will preparatory to making the second and thereafter fails lawfully to execute the same or makes therein an invalid disposition of his property. In such cases it is held that the attempted cancellation of the old will is ineffectual because the full intent is wanting, it being conditional upon the execution of a valid new will. Mr. Underhill, on this subject, says:

" 'It will be presumed (and the presumption is sanctioned by reason and good sense) that the testator meant the cancellation to operate as a revocation only in the event of the will which he had intended to make being valid. If, therefore, he is prevented from executing any will, or the one he intends to make, or if he executes a will which turns out to be invalid, the will which has been revoked will revive.' 1 Underhill on Wills, Sec. 252.

"It will perhaps be more accurate to say that the prior will does not revive, but that the attempted revocation will be deemed ineffectual.

"These principles apply to the present case. The prior will can be deemed to have been revoked only by reason of the fact that the subsequent will is wholly inconsistent therewith, and would be a revocation if it were effectual to the disposition of the entire estate. But it appears that a large portion of the dispositions made is invalid, and by reason of that invalidity the entire estate is not disposed of. The will of 1913 is inadequate to the disposition of the estate, and to that extent it is not inconsistent with the prior will. Consequently, it is not wholly inconsistent therewith, and does not completely revoke it."

The appellants have particularly stressed the proposition that the principle of conditional revocation has no application in a case where the revoking instrument is properly executed, but is invalid because contrary to law, or because of the legal incapacity of the beneficiary to accept. This contention is contrary to both precedent and authority both in this country and in England. In the latter country the question has come before the highest courts over a period of many years, and fully supports the position of the appellees, without regard to whether the revocation was by destruction or cancellation of the old,

will, or by a new instrument, without destruction of the old, and without regard to whether the revocation was express or implied, or whether the later instrument was inoperative because of defective execution, or because of some vice within or without the will. One of the ablest of these opinions, is Ward v. Van Der Loeft (1924), before the House of Lords, 95 Law Journal Reports 397, 405, 40 Times Law Reports 493, argued before the Lord Chancellor (Viscount) Haldane, Viscount Cave, Lord Dunedin, Lord Phillimore, and Lord Blanesburgh. Each wrote separate concurring opinions. Quoting from Lord Dunedin's opinion:

"It was, however urged on behalf of the respondent that Kirkpatrick's case (2 House of Lords 397) depended on the fact that the inefficiency of the new settlement was due to the non-efficiency of the words of conveyance, and that a different result would follow where the inefficiency depends on some inability on the part of the taker, or some incompetence in the interest created. I do not think this is a sound distinction. It would be curious if it were so. The question obviously depends on the intention of the testator, as gathered from the words which he has used, and it is difficult to understand how that intention can be varied accordingly as the inefficiency of the new arrangement depends on whether he has legally carried out his intention by the words he has used, or whether the law has made impossible the thing which he was trying to do. But, as a matter of fact there were many cases quoted before their Lordships who decided Kirkpatrick's case which gave instances of the inefficiency being of the latter sort."

In that case the disposition was to the same purpose in each instrument, but in the codicil it violated the rule against perpetuities. There was no express revocation.

In the often cited case of Duguid v. Fraser (1886), 54 L. T. R. 70, 31 Chancery Division 449, the chancellor said:

"It seems to me that I am not bound in this case to make a revocation, which I cannot conceive the testatrix would have made if she had known that the appointment by the codicil could not take effect. I think the original appointment was not affected by the subsequent attempt to make an appointment which was invalid."

Other English cases, down through the years, supporting

the American decisions cited herein, directly or by analogy, are Campbell v. French, (1797) 3 Vesey, Jr. 321, 30 Eng. Rep. 1033; Ex parte the Earl of Ilchester, (1803) 7 Vesey, Jr. 348; Morley v. Rennoldson, (1843) 12 L. J. Ch. 372, 2 Hare 570; Alexander v. Kirkpatrick (1874), 2 H. of L. 397; In re Fleetwood (1880) 49 L. J. Ch. 514, 15 Ch. D. 594; Venkatanarayana Pillai v. Subammel (1915) 43 Indian Appeals 20, decided by the Privy Council; In re Faris, Deceased, (1911) 1 Irish Reports 469, Chancery Division; Re Southerden (1925) 133 L. T. R. 505, 41 T. L. R. 593.

Discussion of the question and further citation of cases may be found in any text on wills. There is an able article by Prof. Warren in 33 Harvard Law Journal 337. Also two very complete papers showing wide research and sound deductions by Francis T. Cornish in 5 Southern California Law Review 272 et seq., and 393 et seq. (1932) discussing the English and American cases to that time.

We have read all of the cases cited by the appellants. Several are not applicable because of their facts. With others we respectfully disagree.

III. Appellants insist that the second codicil is in fact, the last will and testament of the testator. Conceding this to be true for the sake of argument, or considering it as but a part of the final will, it avails them nothing. We have repeatedly held that an absolute bequest in one paragraph of a will cannot be nullified by a later provision in the same instrument, repugnant to and inconsistent with the first. Frazier v. Wood, 219 Iowa 36, 44, 255 N. W. 647; Todd v. Stewart, 199 Iowa 821, 202 N. W. 844; Reichauer v. Born, 151 Iowa 456, 131 N. W. 705; Law v. Douglass, 107 Iowa 606, 78 N. W. 212; Phillips v. Phillips, 217 Iowa 374, 251 N. W. 511; Bills v. Bills, 80 Iowa 269, 45 N. W. 748, 8 L. R. A. 696, 20 Am. St. Rep. 418.

Appellants argue that the rule is not applicable because there is no repugnancy. In Item 2 of the codicil, the testator makes a complete bequest and devise of all of his residuary estate to Lee county, "under the following terms and conditions:" 1. for the construction of a concrete paved highway, except the cost of any additional necessary right of way, over a route, specifically designated by him. No other terms or conditions are specified in that paragraph. It is a complete disposition

of all of his property after the payment of his debts. In Item 3 of the codicil he gives certain directions to his executor, and certain conditions of acceptance on the part of the county. These directions and conditions are not only inconsistent with and repugnant to the absolute gift in Item 2, with the limitations specified therein, but they completely destroy the gift, and defeat the unmistakable purpose of the testator. Under the foregoing decisions and others with like holdings, the directions and conditions in Item 3, which are repugnant to the disposition in Item 2, must be disregarded as void.

The fact that these repugnant provisions appear later in the will does not permit them to prevail over the earlier disposition in Item 2, since such a rule of construction has no application where the later provisions are invalid and void, or of no force for any reason. Moore v. Moore, 47 Barb., N. Y., 257, 262. This is also true if the last document be considered as a codicil, since the codicil supplants the preceding documents only so far as the latter are inconsistent, and there can be no displacement where the latter are absolutely void. In re Street's Estate, 138 Okla. 115, 280 Pac. 413; Austin v. Oakes, 117 N. Y. 577, 23 N. E. 193.

"It is the settled rule of this state that intestacy will be avoided, if avoidance is in reason possible, and the intention of the testator, if it can be ascertained, will be carried out." Wilmes v. Tiernay, 187 Iowa 390, 393, 174 N. W. 271, 272; Feddersen v. Matthiesen, 185 Iowa 183, 170 N. W. 385; Central Trust v. Langan, 197 Iowa 1202, 198 N. W. 652; Ironside v. Ironside, 150 Iowa 628, 130 N. W. 414; McTigue v. Ettienne, 155 Iowa 450, 136 N. W. 229; Busby v. Busby, 137 Iowa 57, 114 N. W. 559. We have also said that courts do not look favorably upon a construction tending to disinherit those who would take without a will. Hudnutt v. Hancock Mut. Life Ins. Co., 224 Iowa 430, 275 N. W. 581; Ellsworth College v. Carleton, 178 Iowa 845, 160 N. W. 222; Marvick v. Donhowe, 191 Iowa 214, 182 N. W. 182. These rules might be said to neutralize each other. Harvey v. Clayton, 206 Iowa 187, 192, 220 N. W. 25. But it must be remembered that they are merely rules of construction, and not rules of law. As such they are subservient, and but assistant, to that cardinal rule of testamentary construction, whose time-honored application has been

so universal that it has become axiomatic: that the intention of the testator must be ascertained and made effective, if lawful and possible. The fact that Alexander Coleman did not leave it to presumption, but clearly said that he did not desire the appellants to have his property, definitely determines his intention. It is reasonable to suppose that a man who makes one will does not intend to die intestate, but when he makes three wills all to the same charitable purpose, intestacy should be defeated if it is lawfully possible.

The appellants rely upon but one provision of the second codicil to defeat that clear intent. And that is a direction which he gave for the carrying out of his intent. It is plain that this direction was subservient to his charitable intention that his estate "shall be used where it will do the most good to the most people." The statutes of the state of Iowa relative to road building necessarily became a part of his will. He had no intention of violating them, or of allowing any administrative direction of his to defeat his dominant object. And it ought not. It was merely subsidiary to the trust and not constitutive of it. The Rhode Island Court, in Pell v. Mercer, 14 R. I. 412, 430, thus expressed the law:

"The rule is that where the general intent is clear, it will be carried out at the expense of any particular intent which cannot be carried out consistently with it, the paramount purpose being entitled to prevail. Lessee of Findlay v. Riddle, 3 Binney, 139, 162 [5 Am. Dec. 355]. Parks v. Parks, 9 Paige, 107; Purnell v. Dudley, [57 N. C. 203] 4 Jones Eq. 203; Jesson v. Wright, 2 Bligh, 1, 56. In the case of Thellusson v. Woodford, 4 Ves. Jun. 227, 329, it was said that the court is bound to carry the will into effect if they can see a general intention which is consistent with the rules of law, even if the particular mode pointed out by the testator is illegal. Bartlet v. King, 12 Mass. 537, 553 [7 Am. Dec. 99]; Inglis v. The Trustees of the Sailors' Snug Harbor, 3 Peters, [99] 117, 118 [7 L. Ed. 617]. Another rule is that when a will cannot operate to its full extent it shall take effect as far as possible. Thellusson v. Woodford, 4 Ves. Jun. 227, 325. In the case at bar the general intent or paramount purpose is clear and it can be carried out, not precisely in all respects in the manner indicated by the testator, but in a manner which is substantially

as good. It seems clear to us therefore, in accordance with the rules before mentioned or with the principles underlying them, that the general or paramount intent must not be permitted to fail merely because it is coupled with a particular or subsidiary intent which is impracticable. Indeed the mere fact that the will is a will ought to be enough to save it from such miscarriage.''

IV. Other propositions have been argued by the appellants, and have received our careful consideration. We are firmly convinced that they do not justify a reversal. The appellees have urged other grounds in support of an affirmance. In view of the grounds of our decision we do not deem it necessary to discuss the doctrines of cy pres, conditions precedent and subsequent, vested and contingent estates, and other matters contended for.

In the first codicil the testator bequeathed and devised his entire residuary estate to three named trustees, one of whom was P. W. Blackford, to be administered by them for the purpose of improving the specified highways, under the supervision and direction of the proper county and state officials. This disposition in no way contravenes either the law or the public policy of this state. In the second codicil he bequeathed and devised his residuary estate directly to Lee county to be used by it for the construction of the highway therein described. This disposition also is lawful and proper. Therein he also appointed Blackford to be executor of his will and codicils to collect the assets and administer the estate with all of the statutory rights and powers of any executor, with provision for his compensation. He was also authorized to execute any legal papers necessary and to make all payments out of the estate necessary for the construction of the highway. There might be legal papers entirely proper for him to execute, and certainly he would violate no provision of law, or the statutes, or public policy in using estate funds to pay for the improvement. The only provisions of the second codicil which might be construed as contrary to law, the statutes, or public policy, are those whereby he is directed and empowered to exercise governmental functions, with the permission of Lee county, its board of supervisors, and the Iowa State Highway Commission, in the construction of the proposed improvement. If these

provisions are void, as claimed by appellants, they are of no force, revocative or otherwise. All other provisions of the first codicil not in conflict with the valid provisions of the second codicil are therefore in force. Under the valid and unrevoked provisions of the will and the two codicils, Lee county, Iowa, and its board of supervisors are authorized and empowered to accept the bequest of the testator for the purpose of constructing the highway designated therein.

As stated by Justice Hamilton, in his able opinion in In re Nugen's Estate, 223 Iowa 428, 438, 272 N. W. 638, 644, where matters somewhat kindred to contentions made in this suit, are thoroughly discussed, it would be contrary to public policy to indulge in strained construction of the provisions of these testaments to seek out and discover a basis for avoiding the primary purpose of the testator's charitable trust. It is a charitable trust in which Lee county is the trustee, and all users of the proposed highway, and all taxpayers of Lee county are and will be the beneficiaries. The district court of Lee county, in the exercise of its broad equitable powers and jurisdiction, has full authority to supervise and aid in the complete administration and fulfillment of the trust. The charity and beneficiaries are definite, its object specific, its creation legal, and its trustee qualified and competent.

As stated in the Nugen case, supra:

"We must assume that the testator prepared his will in the light of the statutory law of this state, and that wherein the details with reference to the administration dues in the management and control of the library are in conflict with the statutory provisions, the statutory provisions will control, and in such inconsistencies or apparent inconsistencies in matters of mere detail of administration may not be found sufficient reason for holding the trust invalid."

The trial court found, ordered, adjudged and decreed:

"The court further finds that the intent and purpose of the said Alexander Coleman in said last will and codicils was that his entire residuary estate was to be used by Lee County, Iowa, in the construction of a certain specified concrete paved highway * * *

"The court finds that such bequest is one which the said Alexander Coleman had the authority and power to make, and

that said devise and bequest is one which Lee County, Iowa, had the capacity and authority to accept and execute.

"The court further finds that any directions given in said last will and codicils with reference to the manner or method of administration must give way to the general intent and purpose of the testator, and the court finds that it was the intent and purpose of the testator that his executor should administer said estate and convert the same into cash, and that after deducting the expenses of the administration, the remainder and residue of said estate should be used by Lee County, Iowa, in the construction of the specific highway designated.

"It Is Therefore Ordered, Adjudged and Decreed that P. A. Blackford as Executor of the last will and testament and codicils of Alexander Coleman, deceased, be and he is hereby directed to proceed in the administration of said estate under the supervision of the District Court of Lee County, Iowa, in the exercise of its probate powers and that he shall from time to time confer with the Board of Supervisors of Lee County, Iowa, and under the authority and direction of the District Court of Lee County, Iowa, make the remainder and residue of said estate available to said Lee County, Iowa, for the purpose of constructing said highway as hereinabove described and as provided in the last will and testament and codicils of Alexander Coleman, deceased."

This decree is in full conformity with our views and it is our judgment that it ought to be, and it is hereby affirmed in all of its provisions. In view of our decision we do not pass upon the appellees' motion to dismiss.—Affirmed.

SAGER, STIGER, MILLER, OLIVER, and HALE, JJ., concur.

MITCHELL, C. J., and HAMILTON, J., concur in result.