## REED v. UNITED STATES.
### No. 9120.

Circuit Court of Appeals, Eighth Circuit.
July 23, 1931.

Walter F. Maley, of Des Moines, Iowa, for appellant.

Ray C. Fountain, Asst. U. S. Atty., of Des Moines, Iowa (Ross R. Mowry, U. S. Atty., of Newton, Iowa, and Frank F. Wilson, Asst. U. S. Atty., of Mt. Ayr, Iowa, on the brief), for the United States.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

Appellant was convicted on both counts of an indictment charging that he unlawfully, knowingly, and feloniously retained in his possession with intent to convert to his own use certain property of the United States, consisting of harness sets and parts thereof, knowing the same to have been stolen from the United States.

The assignments of error argued and relied on charge as error:

(a) Improper cross-examination of defendant.

(b) Refusal of the court to strike an alleged prejudicial answer on the cross-examination of government witness Burris.

(c) Erroneous admission of government exhibits.

(d) Failure of the court to instruct on certain phases of the case.

(e) Not sustaining the motion for an instructed verdict made at the close of the government's case, and also after the testimony had all been introduced.

These in their order.

The claimed error as to cross-examination is this: When appellant was on the stand he testified that he did have certain army harness in his possession, but that he had purchased same at Fort Des Moines, at Camp Dodge, and in the City of Des Moines; that he had not received any army harness within the last three years knowing it to have been stolen. He was asked on cross-examination a number of questions concerning the meaning of the contents of a certain letter which had been admitted in evidence and which he testified he had written to one Virgil Reynolds concerning certain harness which was part of the property referred to in the indictment but concerning which he had not been interrogated on the direct examination. This letter is as follows:

"Mr. Virgil Reynolds. Dear Friend:

"I set self to let you know that I am very sad to think that the best friend I ever had is mad. Now Virgil, please don't be mad at me. I am not to blame. That boy is the one that done it. Don't be mad at Lula, she is a good woman. I love her better than any one on earth. Now I thought it was salvage stuff. They told me it was. So please do not hold me for all of it. I have always tried to play straight: Just because the boy wanted to try and be smart, just because he don't like me. Now Virgil if I don't have to go to the pen I will pay all the boys their money back. The

set that Dixon got was a set that I bought at the sale so he will get them back. I wish you knew how I felt when I couldn't get you to talk to me.

"Yours,            Jack to Virgil."

References in this letter to "salvage stuff" and going "to the pen" tend strongly to contradict the testimony he had given as to where he had purchased the sets of harness which had been found in his possession and the honesty of such possession. Certainly the cross-examination tended to impeach the statements made by defendant on his direct examination.

This court has not hesitated to reverse convictions where the cross-examination of a defendant was so unwarranted and unfair as to transgress well-established rules of evidence and result in an unfair trial. Haussener v. United States (C. C. A.) 4 F.(2d) 884; Wilson v. United States (C. C. A.) 4 F.(2d) 888. We are satisfied this examination did not so transgress.

When a defendant takes the stand in his own defense, he subjects himself to cross-examination and impeachment to the same extent as any other witness in the same situation, but not to a greater extent. Tucker v. United States (C. C. A.) 5 F.(2d) 818. We think the cross-examination concerning the Reynolds letter was entirely within the bounds of legitimate cross-examination.

■ As to the alleged error of the court in refusing to strike a portion of the answer of one Burris, a stepson of appellant, who entertained very hostile feelings towards him, which appellant seems cordially to have reciprocated, we may say that Burris testified on cross-examination that the defendant chased him off the farm with a gun. Then followed this: "Q. In any event, you left the place? A. Yes, I left, and he said if I ever came back, he would kill me." Appellant's counsel moved to strike out the answer as not responsive to the question. Of course, the words in the answer, "Yes, I left," were entirely responsive, and counsel did not segregate the part he desired stricken as not responsive. It was not error to refuse to strike the entire answer. West v. United States (C. C. A.) 15 F.(2d) 916; Chicago G. W. Ry. Co. v. McDonough (C. C. A.) 161 F. 657. Under the circumstances presented showing that the appellant had chased the stepson, Burris, off the place with a gun, the statement that his stepfather said if he ever came back he would kill him could hardly be considered prejudicial. Where one person is chasing another with a gun it is quite natural to assume that the performance was not merely in the interest of exercise, and a statement from the pursuer that if the pursued returned he would kill him adds but little to the situation.

■ It is insisted that certain exhibits designated as "A to A–1," inclusive, and consisting of sets of harness and parts thereof, were erroneously admitted in evidence; that they were not sufficiently identified. At the close of the government's case on May 8, 1930, counsel for appellant with reference to these exhibits said:

"Mr. Maley: Before making any objection to the several exhibits that have been offered I should like to have a little time to look them over.

"The Court: You can reserve the right to look them over this evening."

On May 9, 1930, appellant filed formal objection to the introduction of Exhibits A to A–1, inclusive.

The court ruled as follows: "The Court: The motions filed by the Defendant are overruled by the Court and exceptions allowed. There is so much confusion about the exhibits that it is impossible for me to tell what should stay in and what should go out, but if you will pick out some particular one that you feel there is no foundation for in the evidence, I will consider it."

It is to be noted that the court called the attention of counsel specifically to the confusion about the exhibits and asked him to pick out the particular ones that he was objecting to, and counsel agreed to renew the matter later, which was not done. It is to be noted also that considerable testimony with reference to each of these exhibits was introduced without objection. The exhibits were in the courtroom. The jury saw them and heard the evidence concerning them, which identified the harness as those found on appellant's place. Only one of the exhibits went to the jury room and to this appellant made no objection. The jury had complete information concerning these exhibits before the offer was made to introduce them in evidence. Some of them were clearly admissible. If others were not, there could be no prejudice under the circumstances shown resulting from their admission.

■ It is urged in argument that certain assignments of error relative to the instructions of the court should be considered. No

**944**

instructions were requested by defendant's counsel and no exceptions were taken to the instructions. These assignments allege error in the court not properly instructing on the question of reasonable doubt, in not stating the correct rule relative to the credibility of witnesses, and in failing to instruct the jury that the government was required to prove the essential elements charged in count 2. It is argued that notwithstanding the fact that no exceptions were taken to the alleged failure of the court to instruct as to reasonable doubt and the alleged erroneous instructions of the court on other subjects, that the errors are so apparent that this court should consider them. An appellate court will notice plain errors not excepted to when it is necessary to prevent a miscarriage of justice. United States v. Rhodes (C. C. A.) 49 F. (2d) 228. Such situation is not presented here. In the first place, the court clearly instructed on the subject of reasonable doubt and credibility of witnesses; and, secondly, there was in our judgment no miscarriage of justice in this case.

The point apparently relied on as of substance is the failure of the court to instruct a verdict for appellant either at the close of the government's testimony or at the close of all the testimony. This requires some review of the evidence. Appellant was a farmer living near the army post at Fort Des Moines, and operating a 200-acre farm. The evidence shows that soldiers from the army post frequently visited this farm and there is testimony that one of them named Shaw brought army harness there at least twice, and other soldiers had been seen coming to the farm with sacks of harness. Parties from near and far were purchasing sets of harness from appellant. In March, 1929, one Hess came thirty miles to this farm and bought a set of new United States army harness from appellant for $20. Later he returned and bought some halters. Virgil Reynolds, hereinbefore spoken of, purchased a set of new United States army harness for $20, and later bought some halters. Other parties who purchased harness were one Barger, who lived thirty miles south of Des Moines. He paid $25 for a set, and on it were brass marks, "U. S.," similar to those appearing on army harness; one Samuelson bought a set of army harness; also the witness Dixon. The standard price for a new set of harness seemed to be $20, although in some instances $25 was secured. These prices paid were much less than such harness

could be bought for at any other place, and purchasers were informed by appellant that he could sell harness cheaper than they could send off and get it. Appellant seemed to do a flourishing business during the year 1929 in selling army harness. In that year the Fourteenth Cavalry stationed at Fort Des Moines were short some twenty sets of army harness, and in December, 1929, were short six pairs of lines. In January, 1930, a raid was made on the farm occupied by defendant by two deputy sheriffs of Polk county, and Captain Bryant, Provost Marshal at Fort Des Moines, and a large quantity of army harness was found by these officers, some in an upstairs room of the house, some in the barn and granary under lock and key, which key was in the possession of appellant. Some harness was found by other parties on other parts of the farm. A number of these sets of harness found in the barn and granary had yellow hames, which was the mark adopted by the Fourteenth Cavalry at Fort Des Moines, and was not adopted elsewhere. Captain Bryant testified concerning some of the harness found as follows: "The harness upon Exhibit L, including Exhibits M, N, O, P, T, U and B, have been in my possession since the date it was seized, January 13, 1930. It is government harness and differs from ordinary harness by its stamps and its style, a different type of traces and breeching. I can identify some of the harness as coming from Fort Des Moines by the yellow hames. That is harness belonging to 14th Cavalry. When component parts of harness, such as hames and other pieces, are assembled and fitted to a mule in the wagon train, or a horse, the cavalry paints their hames yellow; the artillery paints their hames red. It is the first Post I have been in that has adopted that method, and would therefore indicate to me that the harness is the property of the 14th Cavalry. Other markings on the harness indicating it was government property are the brass stampings here U. S. and stamp of U. S. on the leather. For instance, these lines, Q. M. D., Jefferson Depot, 1927, Inspector's initials, J. E. K., made in 1927, and is stamped U. S. That appears on Exhibit N. The same stamp appears upon Exhibit T. Exhibit N is one part of a line, and Exhibit T is the other part of a line."

Witness Bailey, connected with the United States Army, who had a good deal to do with the Fourteenth Cavalry harness, testified: "Don't know of any government sales of harness at Fort Des Moines during that

time. I was sergeant under Captain Slider when he had charge of the transportation pool from August, 1929, until I was discharged January 14th. In December, 1929, I lost 6 pairs of lines, 2 sets of wheel, and 4 sets of lead. Exhibits Z1 and Z2 are samples of the lines issued at that time. These are from Fort Des Moines and are a part of the 40 sets issued to me at the time. Of these 40 sets, 6 pair were missing."

Defendant on the stand admitted having sets of government harness and parts thereof, which he claimed he had bought at sales at Fort Des Moines, Camp Dodge, and in the city of Des Moines. He testified: "During the last three years, I have not purchased any harness or sets of harness or pieces of harness, or government property of any kind, from any officers or soldiers at the Army Post at Fort Des Moines or any of the Exhibits which are scattered throughout the court room. Have not paid any money for harness or government property during the last three years to any officer or soldier. Neither purchased nor received from any officer or soldier at the Army Post at Fort Des Moines, any harness or government property of any kind within the last three years which I knew to have been stolen property."

The testimony disclosed that no new harness was ever sold at Fort Des Moines; that some old leather was sold as salvage. It further showed there were no sales of harness at Camp Dodge. Appellant testified that at an army post sale he put up a $500 certified check, but he had not looked for the check and did not produce it in the trial, although he implied that he had it at home. As to the harness he sold Dixon, he testified he got it at the Hull Brothers sale in 1928 and gave a check for it, but he did not have the canceled check in court. The explanation of appellant as to his possession of government harness evidently did not impress the jury. It is argued by counsel for appellant that all these circumstances merely arouse a suspicion, and that a defendant cannot be convicted upon speculation or conjecture. That is true. This evidence, however, is productive of more than mere suspicion. We do not see how an unprejudiced mind can review the evidence and come to any other conclusion than that the appellant was guilty beyond any reasonable doubt of the crimes charged in the indictment. The case seems free from prejudicial error.

The judgment is affirmed.