## DECATUR WATER SUPPLY CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 6019.

Circuit Court of Appeals, Seventh Circuit.

Feb. 25, 1937.

Ralph J. Monroe, of Decatur, Ill., for petitioner.

F. E. Youngman, of Washington, D. C., Robert H. Jackson, Asst. Atty. Gen., and Sewall Key, Norman D. Keller, and Warren F. Wattles, Sp. Assts. to Atty. Gen., for respondent.

Before SPARKS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

BRIGGLE, District Judge.

This is a petition to review the decision of the Board of Tax Appeals, affirming an order of the Commissioner, levying a deficiency assessment against the petitioner for income tax for the years 1929, 1930, and 1931. The question for determination is whether money received in those years and applied by the taxpayer in retirement of its preferred stock is "income" within the meaning of the Revenue Act of 1928 (45 Stat. 791).

The facts were stipulated before the Board and may be summarized, as follows: Due to a combination of circumstances, not here important, the city of Decatur, Ill., in 1920 found its water supply wholly inadequate, and set about to remedy this condition. It decided to construct a dam across the valley of the Sangamon river near the city and thus create a large reservoir which would be adequate for its future needs. The contract for the dam was let and bonds were issued for the payment of the contract price, but the city, having approached its constitutional debt limit could obtain no further credit, and thus found itself without the necessary funds with which to acquire the lands that would be flooded by the impounding of the water of the Sangamon, as planned.

The city thereupon, through its officers and legal counsel, brought about the organization of the Decature Water Supply Company (the taxpayer herein), which received a charter as a public utility on February 2, 1921, under the laws of the State of Illinois. The company was organized with an authorized capital stock of $1,000,000—$999,000 preferred stock and $1,000 common stock. Public spirited citizens of the city aided its officials in this plan by subscribing for the entire amount of the capital stock of the company. The charter of the company provided that the holders of the preferred stock should be entitled to cumulative dividends at the rate of 7 per cent. per annum and no more and that the preferred stock should be retired by the company at par, after the dividends were fully paid, upon fifteen days' notice to such stockholders; that no earnings of the company should be used for capital expenditures after two years from the date of its incorporation, but must be used either to pay the specified dividends on the preferred stock or to retire the same, and all sums realized from the sale of capital assets, after two years from the date of incorporation should be used to retire preferred stock. It was further provided in the charter that when all the preferred stock of the company should be retired and the debts and obligations of the company should be fully paid and upon the payment of $1,000 to be distributed to the common stockholders of the company that the company should, thereupon, convey to the city of Decatur all of the property and assets of the company and then be dissolved.

Supplementing the charter provisions, the company on April 4, 1921, entered into a separate contract with the city (some pertinent portions of which are appended in a footnote*), providing in great detail that

---

* This Agreement * * *

Whereas, the City is possessed of a water works system, and through such system supplies water pumped from the Sangamon River for use by it for fire protection and other purposes and for the use by the inhabitants and industries of the City; and,

Whereas, the demands and necessities of the City and its inhabitants and industries are growing rapidly and even now are such that the supply of water to be obtained from said Sangamon River under present conditions is wholly inadequate

at certain seasons of the year, and the safety of the city, the health of its inhabitants and the needs of the water users require that water be impounded in the valley of the Sangamon River so that a sufficient and adequate supply of water at all times may be pumped by the City by means of its water works system and supplied throughout the community to the inhabitants and industries thereof, and no other means of securing an adequate supply of water is available; and,

Whereas, City has planned to impound water in the Sangamon River valley by

the company would acquire the necessary lands for creating the reservoir for the storage of water; that the city would operate its pumping plant and filtering system and distribution system, fix the water rates, furnish and sell water and make collections therefor, and deposit the proceeds in the joint account of the city and the company.

The funds so deposited were to be disbursed monthly—first, to the city for its expenses incurred during the preceding month in the operation of its water system; second, the remainder to be divided 10 per cent. to the city and 90 per cent. to the company. It was further agreed that the company would give to the city the option to purchase with-

the construction of a dam across such valley south of said City, and in pursuance of such plan has secured the authorization of a bond issue and has let the contracts for the construction of such dam, and in pursuance of such contracts the work of the construction of such dam is now in progress; and,

Whereas, City after the completion of said dam will not be able to close the flood gates thereof and impound water in said valley by means of said dam to any higher level than that at which said water flows under present conditions before any obstruction to such flow is caused by the construction of said dam without first acquiring either the lands which will be flooded by the impounding of said water, or the right to flood the same, nor without raising such bridges and altering such roads and public highways as will be affected by the impounding of such water as aforesaid; and

Whereas, City has neither the funds nor the credit to acquire such lands to be flooded nor the rights to flood them, nor to alter said roads and public highways nor to raise said bridges; and,

Whereas, the value of the City's pumping plant, water mains and entire water system will be greatly depreciated and a possible source of revenue to the City lost if such water system cannot be used because of an inadequate supply of water, or if used only for purposes of fire protection and a private water company be permitted to furnish water to the City or its inhabitants or industries because of the inability of the City to furnish the same; and,

Whereas, the City has the power to enter into the necessary contracts for a period of not to exceed thirty years to procure a water supply for the City and its inhabitants and industries; and,

Whereas, Water Company is empowered to enter into a contract with the City to furnish an adequate water supply and is financially able to acquire the lands to be flooded by said impounding dam of the City and to alter the roadways and public highways and to raise the bridges necessary before the water can be impounded and thereby, by means of such contract, to enable City to obtain what it otherwise is unable to acquire, namely a sufficient water supply;

Therefore, This Agreement Witnesseth:

1. In consideration of the sum of thirty-five thousand dollars ($35,000.00) to it paid by City as hereinafter provided, and of the profits to be derived from the undertaking as hereinafter set forth and provided, Water Company agrees:

(a) To acquire in its own name all land in the valley of the Sangamon River, in Macon County, Illinois, above the impounding dam of City lying below a level of 615 feet above sea level which is not now owned by City or which City does not now have the right to flood, or to acquire the right to flood the same, and to permit the same to be flooded by the impounding of water by said impounding dam.

(b) To clear all of said lands which will be flooded on the completion of said impounding dam by the impounding of water thereby so that the same will be reasonably fit for use as the basin of the reservoir created by the construction and use of said impounding dam as aforesaid.

(c) To defend all suits and to pay all final judgments recovered therein for damages to lands caused by the impounding of water by said dam to a level of 612 feet above sea-level at said dam.

(d) To pay its own and City's share of all expense of altering roads, highways, and other ways, raising bridges (except the bridge known as the County Bridge), the construction of new bridges and of all other work necessary to be done, except the construction of said impounding dam and the intakes for water from the reservoir above said dam, which may be necessary or required to be done in order that the water in said reservoir may be maintained at a level of 612 feet above sea level at said impounding dam; and to join if requested or required with City in the making of such contracts with individuals, corporations and municipal corporations as may be required to alter such ways, raise, construct or reconstruct such bridges and to do such other work.

(e) Provided, however, that all engagements of Water Company contained in this section of this contract are limited to a total expenditure by it of not to exceed one million dollars ($1,000,000.00), and when such maximum expenditure shall have been made or obligations therefor incurred, Water Company shall be under

in thirty years all its assets to be thus acquired, at a sum sufficient to retire its outstanding obligations and to retire its capital stock, together with 7 per cent. per annum on the preferred shares. The company had nothing to do with the pumping, treating, selling, or distributing of the water supply, which was the exclusive function of the city, and neither did it collect or receive any water rents as such. The company had no other business or source of income, aside from its operations under its contract with the city. The company and the city entered upon the performance of this contract and the property necessary for flood purposes was acquired by the company

no further obligation by reason of anything contained in sub-section (a), (b), (c) or (d) hereof.

2. In consideration of the agreements of Water Company in Section 1 hereof mentioned, City agrees:

(a) To pay to Water Company the sum of thirty-five thousand dollars ($35,000.00) on or before May 1, 1921.

(b) At its own expense to complete said impounding dam and thereafter and during the life of this contract to maintain the same and to make the necessary provisions for taking water from the reservoir formed above said dam upon its completion by the construction of the necessary intakes or otherwise.

(c) By means of its present water system and such additions and extensions thereof as it may hereafter make, including its pumping plant, mains and intakes, to pump water from said reservoir and to supply the same through its water mains to the customers therefor at reasonable rates to be fixed by City and after May 1, 1921, to be collected for the joint account of City and Water Company, City, however, reserving the right to pump such water from said reservoir for its own use in its buildings and fountains, for watering the public streets, for use by its fire department, or for other public purposes, without charge.

3. It is mutually agreed between the parties hereto as follows:

(a) All water rents shall be deposited in some bank or banks to be agreed upon from time to time between the parties hereto to their joint account, and may only be withdrawn and paid out upon vouchers or warrants executed by the proper officers of the City of Decatur for City and the Treasurer of Water Company for Water Company or such other officers as may be selected by them. All water rents accruing and collected after May 1, 1921, shall be divided monthly between the parties as follows: First, City shall be paid out of the joint account above mentioned a sum equal to the expense incurred by it during the preceding month in the operation of its water system exclusive of said impounding dam and reservoir, such expense to include salaries, wages, supplies, insurance and repairs, but not to cover depreciation, betterments nor capital expenditures; Second, the remainder of all collections shall be divided between City and Water Company in the proportion of ten per cent. thereof to City and ninety per cent. thereof to Water Company, and shall be paid out of the joint account to each of them. * * *

In further consideration of the payments to be made to it by City as above provided, and of the undertakings of the City herein contained, Water Company hereby gives and grants unto City and its successors the option within thirty years hereafter to purchase its interest in the joint undertaking and, or in all the lands, property and rights acquired by it and interests of every nature, at a sum sufficient to retire its outstanding obligations, to retire its outstanding preferred capital stock, exclusive of any preferred stock issued as a stock dividend, at its original par value, together with seven per cent. interest per annum on such outstanding capital stock from the date of its issue after crediting thereon any dividends paid upon such outstanding stock, and to pay the expenses of winding up and dissolving Water Company including the sum of one thousand dollars ($1,000.00) to be distributed among the holders of its common stock, such sums to be paid to Water Company in cash; and upon the exercise of such option and the payment to Water Company by City of the purchase entire above mentioned, Water Company shall convey to City free and clear of all liens all of its property and assets save a sufficient amount to pay its obligations, to retire its capital stock in accordance with its charter and to wind up the corporation.

Every obligation herein and hereby imposed upon or undertaken by Water Company is contingent upon the sale of an amount of its capital stock in excess of the total of such obligations at any time incurred or outstanding, and shall become binding upon the Company only as and to the extent financially that such stock is subscribed and paid for; but Water Company agrees to use its best endeavors to secure subscriptions for and the payment of a sufficient amount of its capital stock to insure the completion of all undertakings on its part herein contained.

and the city proceeded to operate its water department and otherwise to perform its part of the contract.

During the immediately ensuing years there was received by the city from the collection of water rents and deposited for the joint account, as indicated, the following amounts: 1921, $162,961.48; 1922, $252,-654.02; 1923, $272,589.09; 1924, $288,566.-13; 1925, $314,643.26; 1926, $327,521.30; 1927, $328,817.54; 1928, $340,181.54; 1929, $346,593.62; 1930, $344,531.38; 1931, $303,-217.94. Upon withdrawal of its proportionate share of the joint account, the company, after payment of its necessary expenses, first paid the 7 per cent. due from time to time upon its preferred stock and at stated intervals used the balance in retirement of its preferred stock at par. It was thus able, by 1934, to retire its entire capital stock, except $211,000, at which time the city exercised its option to take over the assets of the company and paid the company the balance necessary to retire its stock and received conveyance of all of the company's assets. During the taxable years in question the following amounts were received by the company from the joint account and applied to the retirement of preferred stock: 1929, $135,140.00; 1930, $123,000.00; 1931, $75,000.00. The company each year made its income tax return and paid its tax upon all of its net income, except those amounts used in retirement of its preferred stock, which sums it claimed were not taxable. For all years preceding 1929 the Commissioner apparently acquiesced in this position, but has asserted a deficiency for the years 1929, 1930, and 1931 on the basis that such sums are taxable income. The taxpayer conceded and paid a tax upon the sums so paid to its stockholders as dividends but asserts that the payments in retirement of its stock were not taxable income within the meaning of the Act. The taxpayer has paid under protest the amount determined by the Commissioner and it is stipulated that if the taxpayer is liable the amount as determined is correct and that if no liability exists such sum should be refunded.

It is thus seen that the corporate entity (the taxpayer) was but an instrumentality adopted by the city of Decatur for the accomplishment of a specific purpose. As a means of raising necessary funds, citizens subscribed to the company's stock, thus creating a fund for the acquisition of the property required by the city. The city in effect pledged its water revenue for the

repayment of this capital by agreeing that all over operating expenses be set up in a special fund, 90 per cent. of which was paid to the company. The company in turn was obligated by its charter provisions and by its contract to apply its percentage of this fund (after payment of expenses and 7 per cent. dividends on preferred stock) to the retirement of its preferred stock at par. From the time of its receipt such fund was earmarked for a single purpose—the return of capital to its preferred stockholders. The company could not and did not profit by its receipt, but in effect it acted as an agency for restoring to the investors the corpus of their investment. To the extent that seven per cent dividends were paid, a taxable income is conceded, but it is difficult to see how this restoration of capital can equitably be said to be a taxable income of the company.

The Revenue Act of 1928, § 22(a), 45 Stat. 791, 797 (26 U.S.C.A. § 22(a) and note) provides that " 'gross income' includes gains, profits and income derived from * * * trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." The Board in its opinion said: "Obviously all of the amounts collected from the users of water were income to someone. The share allocated to the petitioner was not income· to the city. * * * all of the amount received by the petitioner was income to it." We do not accept this as sound as we think that all the water rents when collected were income of the city. That a portion of them was later allocated to the company would not destroy their character as income of the city. If they became taxable income of the company at any time they did so when they later came into the company's treasury after the apportionment. However, they came to the company not with any freedom of disposition but burdened with the unalterable obligation to return them to the preferred stockholders in retirement of capital. In Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 193, 64 L.Ed. 521, 9 A.L.R. 1570, in discussing the meaning to be given the word "income" the Supreme Court, after approving a previous definition that income may be defined as the gain derived from capital, said: "Here we have the es-

sential matter: not a gain *accruing* to capital; not a *growth* or *increment* of value in the investment; but a gain, a profit, something of exchangeable value, *proceeding from* the property, *severed from* the capital, however invested or employed, and *coming in*, being *'derived'*—that is, *received* or *drawn by* the recipient (the taxpayer) for his separate use, benefit and disposal—*that* is income derived from property. Nothing else answers the description." This language was used in determining that a stock dividend was not income to an individual stockholder but was only evidence of his interest in the capital, but is equally applicable as a guide in determining whether the fund in the instant case was received by the taxpayer as income. Continuing, the court said, "the essential and controlling fact is that the stockholder has received nothing out of the company's assets for his separate use and benefit." How can it be said in the instant case that the Company has received anything for its use and benefit? The money received was for the use and benefit of those who had furnished the capital—the preferred stockholders. The charter and contract set up a barrier to its use otherwise. The Company had no freedom of disposal, but its disposition was limited to a very narrow channel; rather do we think it fairer to say that such sums were at the predetermined disposal of the city. Such funds had no exchangeable value because of the restrictions attaching to their receipt. The company was not enriched by their receipt either in fact or on its books. When it reduced its stock liability by the return of such funds to stockholders, it also reduced by that same amount its future right to receive the capital investment made for the city. To state it in another way the city gained by such payments an additional equity of equal amount in the property it had optioned from the company and which the company later transferred to it. With each payment to the company, thus earmarked for its stockholders, the city built up an additional equity in the property in ratio to the sums paid. Carried to its ultimate consummation it meant the return in full of the funds advanced by the preferred stockholders and the acquisition, unrestricted by the city, of the property which those funds purchased— a simple transfer of the property purchased to the municipality, without profit to the company, and in full compliance with the letter and spirit of the charter and contract.

Respondent approaches petitioner's contention with the assertion "it is not based upon a difference in the source from which the particular monies are derived or in the character of the payments received, but upon *the disposition* which the petitioner made of the monies after it obtained them. Actually, therefore, although not in plain terms, the petitioner is claiming *a deduction* from its income, the deduction claimed being the sums which petitioner paid during each of the taxable years in redemption of shares of its preferred stock." While the disposition made by the company of the sums received is necessarily a part of the whole transaction and not to be lost sight of, yet the fallacy of respondent's position lies in his assumption as a verity of the very point at issue—whether the money *when* received was a taxable income. Obviously if "income" when received we are not concerned with taxpayer's disposition of it afterwards and whether the use made constituted a proper deduction is beside the question as petitioner has made no such claim. It may be conceded that only such deductions as are clearly provided for by Congress may be made, but we do not agree that the question here presented may be determined on the basis of whether the retirement of preferred capital stock may be treated as a deduction. That the sums received for retirement of the preferred capital stock may have been accumulated in a trust fund and actual retirement accomplished only at stated intervals does not change the character of the fund when received. This was the only practical way it could be done as obviously the earmarked fund would not always be in the proper amounts for immediate liquidation of the preferred stock.

It would be only by closing our eyes to the undisputed facts, which so clearly disclose the purpose of the parties that we could say this fund was an income to the company. The court further said in the Eisner Case: "We have no doubt of the power or duty of a court to look through the form of the corporation and determine the question of the stockholder's right, in order to ascertain whether he has received income taxable by Congress without apportionment." In the case of Edwards v. Cuba Ry. Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, the taxpayer corporation owned and operated a railroad in Cuba under a franchise from the Cuban Government. By the terms of that franchise, the Cuban Government agreed to pay a certain sum

per kilometer for railroad track constructed and maintained. At the time the case arose these subsidy payments amounted in all to $1,642,216.20, or about one-third of the cost of the railroad. By the terms of the contract with the Cuban Government, the taxpayer corporation was required to render certain services to the Cuban Government at less than the regular tariffs. All of the subsidy payments under the contract were carried in a suspense account until June 30, 1916, when it was transferred to surplus account and was used for capital expenditures. The cost of the construction as carried on the company's books was not reduced by such payments. It was contended by the Commissioner that the subsidies were merely payments in advance on account of transportation service later to be performed by the plaintiff for the Government, and therefore income and taxable as such. The Supreme Court in that case disregarded the form of the transaction and said that the subsidy payments, being proportionate to mileage completed, indicated a purpose to reimburse the plaintiff for capital expenditures, and not for services rendered or to be rendered. It held that they were not profits or gains for the use or operation of the railroad and not income for taxation purposes. Respondent attempts to distinguish this case upon the facts and denies any analogy to the instant case. A careful examination of the facts of that case, however, convinces us that the analogy is pronounced and the decision persuasive.

Respondent further says: "Moreover, if any part of Petitioner's monthly share of collected water rents was not a part of its gross income it was an inseparable and unallocable part of the whole, the impossibility of proving which leaves the claimant upon whom the burden rests, with an unenforceable claim, a misfortune to be borne by him * * *." The facts do not bear this out. True, 90 per cent. of the remaining fund was set aside to the company but for the purpose of paying, first, its operating expenses, second, the 7 per cent. dividend to preferred stockholders, and, third, in retirement of preferred stock at par. The first and second purposes were definitely fixed and were for easily ascertainable amounts, leaving the balance available for retirement of capital a very definite sum. This amount was established by the company and by stipulation of the Commissioner conceded to be correctly established.

The situation here presented is an unusual one and should be viewed from a broad equitable standpoint. The form of the transaction is entitled to consideration but not to the exclusion of the substance. We are satisfied that the conclusion we have reached speaks the true situation.

The order of the Board of Tax Appeals is reversed and the cause remanded for further proceedings consistent herewith.

Reversed and remanded.