# UNITED STATES v. PICKWICK ELECTRIC MEMBERSHIP CORPORATION.

## No. 10131.

Circuit Court of Appeals, Sixth Circuit.

Dec. 4, 1946.

Berryman Green, of Washington, D. C. (Douglas W. McGregor, Sewall Key, A. F. Prescott, and S. Dee Hanson, all of Washington, D. C., and William McClanahan, and John Brown, both of Memphis, Tenn., on the brief), for appellant.

Stuart McCloy, of Memphis, Tenn. (Snowden, Davis, Brown & McCloy of Memphis, Tenn., on the brief), for appellee.

Before HICKS, ALLEN, and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The Appellee, Pickwick Electric Membership Corporation, filed this action in the District Court to recover internal revenue taxes, penalties and interest totaling $5,532.11 which it claimed were illegally assessed and collected for the fiscal years ending June 30, 1940 and June 30, 1941. Appellant appeals from a judgment in favor of the Appellee. The questions presented are (1) whether the taxpayer, during the taxable years in question, was exempt from payment of income taxes under § 101(8) or (10) of Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 101(8, 10); and (2) whether the amounts collected by the taxpayer from its members during those years as "amortization charges" to be used to pay interest and principal on long-term obligations, constituted taxable income or capital contributions.

The District Judge made careful and detailed findings of fact, controlled largely by documentary evidence, which, except for some conclusions objected to as conclusions of law, are amply supported by the evidence and apparently accepted by the parties. It would unduly lengthen this opinion to repeat them in detail. The following summary presents the issue and the controlling facts:

The Pickwick Electric Membership Corporation was organized December 16, 1935 under Chapter 32, Public Acts of the Extraordinary Session of 1935, of the State of Tennessee, and was by force of Chapter 231, Public Acts of 1937, of the State of Tennessee, automatically converted to a corporation authorized by the said latter Act, which also repealed the 1935 Act. It was organized by residents of McNairy,

Hardin and Chester Counties, Tennessee, who were interested in rural electrification and who met December 13, 1935 for the purpose of organizing and authorizing the incorporation of the taxpayer under the Electric Membership Corporation Act of the State of Tennessee. No electricity had been available in some communities. Citizens of the communities generally favored taxpayer's organization. Through the taxpayer many unincorporated community centers, rural districts, schools and towns have benefited through the advantages of electricity.

About August 16, 1939, the taxpayer purchased an electric distribution system from the Tennessee Electric Power Company for approximately $275,000. The purchase price was paid by the taxpayer with funds borrowed from Rural Electrification Administration, and power was contracted for from the Tennessee Valley Authority as a result of this purchase. The taxpayer acquired and served approximately 1,600 new consumers who had not previously been members of the cooperative. On July 31, 1940, the taxpayer sold the part of its system of lines and equipment, purchased from the Tennessee Electric Power Company, which were east of the Tennessee River, to the Tennessee Valley Electric Cooperative. As of June 30, 1940 and June 30, 1941, the members and non-member consumers were as follows:

|  | 1940 | 1941 |
|---|---|---|
| Memberships | 1,274 | 2,095 |
| Total number of consumers | 2,700 | 1,613 |

Where it was not possible to provide service for members, their membership fees were refunded.

On or about June 9, 1939, the taxpayer was duly converted into a cooperative, general welfare, non-profit membership corporation under Chapter 176 of the Public Acts of 1939, State of Tennessee, and existed and acted under and by authority of said Act for its fiscal years ending June 30, 1940 and June 30, 1941. At a special meeting held on June 13, 1939 new by-laws were adopted. These provided, among other provisions, for a membership fee of five dollars; that service could be rendered to governmental agencies, political sub-divisions and other persons not in excess of ten percent of its members; that for the purpose of continuing service and avoiding hardships when the company acquired electrical facilities devoted to public use it could continue to serve non-members, but that non-members would be limited to forty percent of the total persons served and would have the right to become members on non-discriminatory terms; that every consumer served should pay a monthly amortization charge, at the same time the monthly bill for electric energy was payable, equivalent to one cent for each kilowatt hour of electric energy used up to the first one hundred kilowatt hours, such charge to be no less than 25 cents nor more than one dollar per month, with the revenue from such charges to be segregated from all other revenues and to be used exclusively for payment of the principal or interest on any long-term indebtedness issued or assumed by the cooperative; that the trustees should not receive any salary for their services, excepting an allowance for attendance at meetings; and that all the revenues of the cooperative (exclusive of amortization charges) for any fiscal year in excess of the amount necessary for the payment of all current operating expenses, interest on bonds, notes and other indebtedness and the establishment and maintenance of reasonable reserves, should, subject to contractual obligations, be distributed by the cooperative to its members, as either (1) patronage refunds, or (2) by way of general rate reductions, or (3) by combination of such methods.

The trust indenture between the taxpayer and the Hamilton National Bank of Chattanooga, as trustee, to secure notes executed by the taxpayer on account of sums owing the Government and the Tennessee Valley Authority provided that the taxpayer apply all moneys received by it and not required for operation and maintenance, replacements and extensions in the usual course of business, and reasonable reserves for working capital, to the payment of the principal and interest of the notes. The amended power contract between the taxpayer and the Tennessee Valley Authority required the taxpayer to add

to all billings the amortization charges referred to above and to continue such charges until all notes, bonds, or other evidences of long-term indebtedness were fully paid, and that such revenues be held segregated and considered trust funds exclusively for that purpose; that gross revenues be applied first to the payment of all current operating expenses, next to the payment at maturity of interest on all system indebtedness and for amortization charges and/or sinking fund requirements and then to setting up reasonable reserves; that all remaining revenues should be considered surplus revenues and devoted to the purchase or retirement of system indebtedness; and that any remaining surplus revenues should next serve as a basis for the reduction or elimination of amortization charges, and thereafter for the reduction of rates.

The members paid the amortization charges which were collected from them on an equitable basis and were segregated from all other revenues and held applicable exclusively to the payment of system indebtedness. The governmental agencies having principal control over the taxpayer's books considered the amortization charges as capital and not as income. The taxpayer did not return the amortization charges as income in its returns filed for the years ending June 30, 1940 and June 30, 1941.

During the taxable years in question the rates charged non-member consumers were approximately the same as those charged by the private power companies whose transmission system had been acquired by the taxpayer until such non-member consumers became members of the cooperative. The rates paid by non-members during the taxable years were equal to, or higher than the rates charged to members, plus members' amortization charges. Amortization charges were not assessed against non-member consumers.

During the taxable years in question the plaintiff complied with, and operated in accordance with, its by-laws, its contracts and agreements and the law of the State of Tennessee. Revenues from power sales, under the statute to which it owed its existence, received each fiscal year in excess of the amounts necessary to accomplish well-defined statutory purposes, among which were education in cooperation and the dissemination of information concerning the effective use of electric energy, and other information concerning the services made available by the taxpayer, were to be distributed to its members as, and in the manner, provided in the by-laws. Revenues in excess of those required for expenses and losses and statutory purposes were the property of members.

The District Judge found as facts that the taxpayer was organized on a non-profit basis for the purpose of promoting the general welfare of the communities and citizenry served, and at all times during the taxable years in question was a general welfare corporation not organized for profit, and that the amortization charges were contributions to the capital of the taxpayer. He held as a matter of law that the taxpayer was a civic league or organization, not organized for profit but operated exclusively for the promotion of social welfare and exempt from taxation for the years in question under § 101(8) of Internal Revenue Code; and that the amortization charges collected by the taxpayer for the years in question being contributions to capital were not taxable income.

▆▆▆▆ § 101 of Title 26 U.S.C.A. Int. Rev.Code provides—

"The following organizations shall be exempt from taxation under this chapter— * * *

(8) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes; * * *

(10) Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 per centum or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses; * * *."

We agree with the ruling of the District Court that appellee is exempt under the provisions of § 101(8) quoted above, which makes it unnecessary to consider whether it also comes within the provisions of § 101(10) also quoted above. We do not agree with appellant's contention that since the appellee is a cooperative company within the general provisions of § 101(10) it can not seek exemption under § 101(8). The two exempt classifications are cumulative, not mutually exclusive. In order for the appellee to be exempt under § 101(8) the following three conditions must exist: (1) It must be a civic league or organization; (2) it must not be organized for profit, and (3) it must be operated exclusively for the promotion of social welfare. It is not necessary that its net earnings be devoted exclusively to charitable, educational or recreational purposes, as that provision of the subsection pertains only to local associations of employees, and is not applicable to civic leagues or organizations such as the appellee. Hanover Imp. Soc. v. Gagne, 1 Cir., 92 F.2d 888.

No serious contention appears to be made that appellee is not a civic league or organization. "Civic" is defined as pertaining to a city or a citizen; relating to the community. A civic league or organization embodies the idea of citizens of a community cooperating to promote the common good and general welfare of people of the community. It seems clear that appellee falls within such a classification. Garden Homes Co. v. Commissioner, 7 Cir., 64 F.2d 593, 599; Debs Memorial Radio Fund v. Commissioner, 2 Cir., 148 F.2d 948, 951; Amalgamated Housing Corporation v. Commissioner, 37 B.T.A. 817, 825 [affirmed on order, 2 Cir., 108 F.2d 1010].

It seems also clear that the taxpayer was not organized for profit. The organizers were interested in rural electrification, electricity at a more reasonable rate than furnished by private power companies, and were not seeking a medium for investment of idle or available funds. The actual purpose is not controlled by the corporate form or by the commercial aspect of the business transacted, but may be shown by extrinsic evidence, including the by-laws and the method of operation. Debs Memorial Radio Fund v. Commissioner, supra. The trust indenture channeled excess earnings into debt retirement. The by-laws required surplus revenues after operating costs, payment on indebtedness and the establishment of reasonable reserves to be distributed to its members in the form of patronage refunds or general rate reductions, both methods of distribution directly furthering the original purpose of providing electricity at more reasonable rates. The power contract with the Tennessee Valley Authority also required ultimate excess revenues to be used for the reduction of rates. Such obligations and methods of operation completely negative the usually accepted meaning of profit motive. It is true, as contended by the Government, that the taxpayer was organized and operated through its originally established rates for the purpose of collecting more revenue than required to meet its operating costs, required payments on indebtedness and establishment of reasonable reserves, and to that extent it was organized for the purpose of making a profit and actually made one. But whatever profit was made in that narrow sense of the word was only a tentative one and so closely related to a readjustment of rates that it was not an actual profit in the real meaning of the word over the longer period of time. It was sound business judgment to establish rates that would not result in an operating loss and the resulting margin of safety, allocated in advance to the cooperative purpose of the organization, is not the profit motive contemplated by the statute. Crooks v. Kansas City Hay Dealers Ass'n, 8 Cir., 37 F.2d 83; Hanover Imp. Soc. v. Gagne, supra; Debs Memorial Radio Fund v. Commissioner, supra. Nor do we think the fact that as a part of the overall plan electricity was also furnished to non-members at a profit which inured to the benefit of the members makes any material difference. It was a necessary incident in its development and purchase of operating facilities already dedicated to public use, and was not a part of the basic policy of the company. Non-members had the right to become members on non-discriminatory terms. Most of the

non-member consumers acquired in 1939 when the company purchased the electric distribution system from the Tennessee Electric Power Company were eliminated as non-members by the close of the fiscal year ending June 30, 1941. As was said in Trinidad v. Sagrada Orden, 263 U.S. 578, at page 582, 44 S.Ct. 204, at page 206, 68 L.Ed. 458, "That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed."

We also are of the opinion that the appellee was "operated exclusively for the promotion of social welfare" within the meaning of the statute. Providing electricity at low cost to citizens of a community, in some instances where electricity was not available before, is promoting social welfare. Compare Helvering v. Davis, 301 U.S. 619, 672, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319; Garden Homes Co. v. Commissioner, supra, 7 Cir., 64 F.2d 593, at page 599. The Government's contention is that it was not operated exclusively for that purpose in that its earned income inured to the benefit of its members in the form of patronage refunds or reduced rates. Patronage refunds are in substance an indirect form of reduced rates. It is pointed out that the members did not receive such returns in either the Hanover Imp. Soc. case or the Debs Memorial Radio Fund case. Reliance is placed upon Amalgamated Housing Corporation v. Commissioner, 2 Cir., 108 F.2d 1010, affirming the Board of Tax Appeals in 37 B.T.A. 817, and on Industrial Addition Ass'n v. Commissioner, 6 Cir., 149 F.2d 294. But the ruling in both of the two last cited cases was that cash payments to persons who had invested substantial sums in the enterprise were dividends on stock instead of interest on indebtedness as claimed, and

for that reason the company was organized for profit and not operated exclusively for the promotion of social welfare. In the present case there was no cash distribution, and the members, paying only a nominal membership fee of five dollars were not investors. Benefits through the form of rate reductions are not dividends on investments any more than any other reduction in the cost of living can be called such. Such a benefit is the result of the successful promotion of social welfare by the company. The participation on the part of the members in the benefits of such social welfare does not mean that the operations are for their individual benefit instead of for the benefit of the community. In both the Hanover Imp. Soc. case and the Debs Memorial Radio Fund case, the stockholders shared in the beneficial results to the community from the social welfare work of the company. Non-members had the right to become members on a nondiscriminatory basis and share alike in the benefits provided by the company. The fact that the members may receive some benefit on dissolution upon distribution of the assets is a contingency too remote to have any material bearing upon the question where the association is admittedly not a scheme to avoid taxation and its good faith and honesty of purpose is not challenged. Crooks v. Kansas City Hay Dealers Ass'n, supra, 8 Cir., 37 F.2d 83, at page 87.

Our conclusion that the appellee was exempt from payment of income taxes for the taxable years involved makes it unnecessary to consider the Government's further contention that the "amortization charges" should have been treated as income instead of capital contributions.

The judgment of the District Court is accordingly affirmed.