**KEOKUK & HAMILTON BRIDGE, Inc. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 14029.

United States Court of Appeals Eighth Circuit.

Feb. 16, 1950.

E. W. McManus, Keokuk, Iowa, (J. O. Boyd, Keokuk, Iowa, on the brief) for petitioner.

Harry Marselli, Special Assistant to the Attorney General, (Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack, Lee A. Jackson, and Harry Baum, Special Assistants to the Attorney General, on the brief) for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and RIDDICK, Circuit Judges.

GARDNER, Chief Judge.

This case is before us on petition to review a decision of the Tax Court of the United States which sustained income and excess profit tax deficiencies against petitioner for the years 1941, 1942 and 1943, in the aggregate amount of $129,700.-95. The facts though not in dispute are somewhat complicated.

The income in question resulted from the operation of a toll bridge spanning the Mississippi River from Keokuk, Iowa to Hamilton, Illinois. The bridge was constructed prior to 1870 by the Keokuk and Hamilton Bridge Company, an Iowa corporation, and was owned and operated by that company until the early part of 1941, at which time the legal title to the property passed to the petitioner, Keokuk and Hamilton Bridge Company, a corporation organized under the laws of the State of Delaware, for purposes and reasons hereinafter disclosed. The bridge has an overall length of 4400 feet and there is no other bridge across the Mississippi River within twenty-five miles. It has an upper and lower deck, the upper deck accommodating pedestrians and vehicular traffic and the lower deck accommodating railroad traffic, and it constitutes a part of the east and west national highway system.

For a number of years prior to 1941 there had been considerable agitation at Keokuk in favor of the acquisition of a free bridge. A committee of local citizens was appointed by the City Council to negotiate with Keokuk and Hamilton Bridge Company for the purchase of the bridge property or the construction of a new bridge. As a result of negotiations between the City and the Bridge Company the City offered $500,000 for the bridge, while the Bridge Company asked $1,350,-000. Thereafter steps were taken looking to the procurement of a franchise for the construction of a new bridge and a bill authorizing such construction passed the Lower House of Congress. As a result of these and other negotiations and activities the Keokuk and Hamilton Bridge Company on February 7, 1941, made a formal gift proposal of the bridge property to the City of Keokuk. This proposal recited, among other things, that the donor was desirous of giving the bridge property to the City and dedicating it to the public as a free bridge; that the property was encumbered by mortgages securing some $1,-089,000 of bonds which donor reserved the right to acquire and liquidate from the proceeds of a new issue of revenue bonds in an amount not to exceed $775,000; that on retirement of the old bonds it would execute a conveyance of all its property to the City, subject to the new bond issue and subject to the condition that the bridge be forever free to vehicular and pedestrian

traffic, and thereupon would deposit such conveyance, with a copy of the gift proposal, with the State Central Savings Bank as depository; that insurance be carried with loss payable to the donor, trustee, and the City, as their interests appear; that the donor should maintain its corporate existence until the bonds were retired, for the purpose of assuring their payment and of supplying management for the bridge; that operating expenses should be limited to $60,000, all revenues to be deposited with the State Central Savings Bank, and any excess over operating and maintenance expenses to be applied solely to the retirement of the bonds as provided in the indenture securing the bonds; that upon the final payment of the new bond issue and the performance of the other conditions, the depository should deliver the title papers and turn the management over to the City; that if, prior to the retirement of the bonds, construction of another bridge should be commenced within five miles of the existing bridge, such would constitute a defeasance and a reverter to the donor; that a schedule of tolls should be maintained sufficient to meet the operating expenses and provide a sinking fund for retirement of the bonds; that the consulting engineers should prepare and submit an annual statement of operating expenses and supply a copy to the donor, donee and trustee, and that no substantial expenditure should be made above that required for ordinary and normal operation, unless the donor, donee and trustee representing the bondholders agreed. On the same date as the gift proposal the City Council of the City of Keokuk adopted a resolution accepting the proposal.

On April 28, 1941, petitioner was chartered under the laws of Delaware, and on the same day the City of Keokuk addressed to petitioner formal notice that it would accept a deposit in escrow of a conveyance from petitioner of the property described in the gift proposal, with the understanding that petitioner would be subject to all the terms and conditions of the proposal. On May 1, 1941, petitioner executed and delivered to Guaranty Trust Company of New York and Arthur C. Burke as trustees its mortgage indenture securing $775,000 first mortgage sinking fund 4% bonds. The indenture contained detailed covenants which required that all revenue derived from the operation of the bridge be promptly deposited with the State Central Savings Bank in a special trust account designated as Keokuk and Hamilton Bridge, Inc., Revenue Fund. The depository was then required to create two accounts, one designated as a "Revolving Fund," and the other as a "Sinking Fund." The Revolving Fund was limited to $5,000 and was for operating and maintenance, and the Sinking Fund was solely for payment of principal and interest on the bonds. There was an express covenant that petitioner would pay no dividends nor make other distribution to its stockholders so long as any of the bonds were outstanding.

From the proceeds of this bond issue petitioner acquired the bridge property from Keokuk and Hamilton Bridge Company by conveyance dated May 1, 1941, and on June 18, 1941, it executed a conveyance of all the bridge property to the City of Keokuk, subject to the mortgage indenture, and on condition that the bridge be maintained as a free bridge. On the same date there was deposited with the State Central Savings Bank a copy of the gift proposal, trust indenture, conveyance to the City of Keokuk from petitioner, the certificate representing all of the petitioner's outstanding stock, a copy of the resolution of acceptance by the City of Keokuk, and an instrument whereby the City consented to the performance of the gift proposal by petitioner. The deposit was accompanied by agreement between petitioner, James M. Fulton, its sole stockholder, the City of Keokuk, and the State Central Savings Bank, which agreement recited the deposit of the various documents and the terms. It provided that the bank should deliver the deed, together with all funds on hand, to the City of Keokuk whenever it was advised by the trustees under the indenture securing the bonds that the bonds had been paid in full or that there were sufficient funds on hand to retire them. It also provided that if, prior to the retirement of the bonds, the bank was advised

by the consulting engineers that another bridge had been constructed or that construction had been commenced upon another bridge within five miles of the existing bridge, the deed and other documents were to be delivered to petitioner. Both the directors and the stockholders of the petitioner by appropriate action unanimously authorized the execution and carrying out of the gift proposal and authorized the execution of necessary conveyances, and to do all things appropriate to the carrying out of the proposal.

Following the deposit of the various instruments petitioner assumed the management of the bridge and deposited all revenues arising from its operation in strict compliance with the gift proposal and mortgage indenture. At no time since its organization has it paid dividends or made distribution of any kind to its stockholders and has engaged in no other activity and enjoyed no other income. Insurance in the amount of $900,000 was carried on the bridge property. As of December 31, 1947, the outstanding bonds had been reduced to $173,000 and all interest paid, and at the time of the trial there was available in the Sinking Fund an additional $75,000 for further bond retirement.

Proceedings in the Tax Court were commenced by the filing of petitioner's petition on April 15, 1946, and various hearings and proceedings were thereafter had up to and including May 28, 1948. Findings of fact and opinion of the court were not handed down until February 28, 1949. Following the promulgation of the decision by the Tax Court petitioner asked to amend its petition to conform to the proof of material facts made at the hearing but omitted from the findings of fact, and also to set forth material facts occurring subsequent to the hearing but prior to the promulgation of the decision so as to show that subsequent to the hearing all the bonds secured by the mortgage indebtedness had been paid off and that pursuant to notice to that effect the bank had delivered to the City of Keokuk all instruments deposited in escrow, including the deed and all cash on hand, and that the bridge had become free of tolls pursuant to the gift proposal. This motion was denied. However, on oral argument it was conceded in open court that all the conditions of the gift proposal had been complied with, the bonded indebtedness paid off and the property turned over to the City as a free bridge, and the case was argued on that assumption.

In seeking reversal petitioner contends substantially as follows: (1) the court erred in holding that the receipts collected by petitioner for the years involved constituted taxable income to petitioner within the contemplation of the Internal Revenue Code, 26 U.S.C.A. § 1 et seq., and the Sixteenth Amendment to the Constitution; (2) the gift proposal and its acceptance by the City of Keokuk constituted a charitable trust under the laws of Iowa and vested the City with an immediate equitable interest in the bridge property subject to a reverter, and the Tax Court erred in not so holding; (3) the Tax Court erred in holding that petitioner was not an instrumentality of the City of Keokuk in earning the income in question and in not holding that the City was exempt; (4) the Tax Court erred in not holding that the income collected by the petitioner from the operation of the bridge without gain to itself or its stockholders, did not constitute replacement or resoration of capital; (5) the Tax Court erred in holding that the excess of receipts over expenditures applied to the retirement of the bonds was not under all the circumstances exempt from taxation; (6) the Tax Court erred in holding that petitioner was not entitled to depreciation or amortization credit by reason of the inevitable extinguishment of its ownership and interest in the bridge properties upon retirement of the bonds; (7) the Tax Court erred in denying petitioner's motion for leave to amend its petition to conform to the proof and to reflect the occurrence of material events which transpired subsequent to the trial below.

Petitioner was organized with a capital stock of $1,000, for the sole purpose of carrying out the gift proposal. True, under its charter it had authority to exercise and to continue to exercise cor-

porate functions, but, as has often been said, in Federal income tax matters the law regards substance rather than form. The petitioner was a mere agency for effectuating the terms of the gift proposal. It was obligated to apply the income collected to the reduction and ultimate complete payment of the indebtedness which was a primary lien on the bridge property. The payment of the bonded indebtedness did not increase the equity of the corporation because as that indebtedness was paid the equity of the City was increased. In other words, the discharge of the indebtedness did not inure to the benefit of the petitioner. The petitioner had no claim to the income nor did it have any substantial claim to the property which earned the income, but the City of Keokuk was the beneficiary of the income which reduced the bonded indebtedness against the property which it received under the gift proposal. Under the Iowa Gift Statute the City had the right to accept the gift, and the fact that the terms of the gift proposal were effectuated through the instrumentality of a private corporation with powers to engage in activities for profit, does not change the actual character of the transactions involved. Central Life Assur. Society v. Commissioner, 8 Cir., 51 F.2d 939; Bettendorf v. Commissioner, 8 Cir., 49 F.2d 173; Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, 166 A.L.R. 884; Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; United States v. Pickwick Electric Membership Corp., 6 Cir., 158 F.2d 272; Garden Homes Co. v. Commissioner, 7 Cir., 64 F.2d 593; Decatur Water Supply Co. v. Commissioner, 7 Cir., 88 F.2d 341.

In Central Life Assur. Society v. Commissioner, supra [51 F.2d 941], this court speaking through Judge Stone, said, "Tax laws are essentially practical in their purposes and application, and the federal income tax laws are no exception. While, for purposes of convenience and certainty in collection of such taxes, it is sometimes provided that those who collect income for others shall pay therefrom the taxes thereon, yet a cardinal purpose of the income tax laws is to tax the income to the person who has the right or beneficial interest therein, and not to throw the burden upon a mere collector or conduit through whom or which the income passes. * * * It is also a basic principle in the application of such laws that substance and not mere form be regarded as governing."

In Bettendorf v. Commissioner, supra [49 F.2d 175], it is said, "The purpose of the income tax law was to tax incomes actually and substantially derived, rather than such as might be constructively received. We must assume that it was not the purpose of the act to penalize an individual because he might be the innocent agency by or through whom a substantial income was derived for some one else."

In Commissioner v. Wilcox, supra [327 U.S. 404, 66 S.Ct. 549], in seeking to define taxable income the court said, "For present purposes, however, it is enough to note that a taxable gain is conditioned upon (1) the presence of a claim of right to the alleged gain and (2) the absence of a definite, unconditional obligation to repay or return that which would otherwise constitute a gain. Without some bona fide legal or equitable claim, even though it be contingent or contested in nature, the taxpayer cannot be said to have received any gain or profit within the reach of Section 22(a) [26 U.S.C.A. § 22(a)]. * * * Nor can taxable income accrue from the mere receipt of property or money which one is obliged to return or repay to the rightful owner, as in the case of a loan or credit. * * * But apart from such factors the bare receipt of property or money wholly belonging to another lacks the essential characteristics of a gain or profit within the meaning of Section 22(a)."

In Griffiths v. Commissioner, supra [308 U.S. 355, 60 S.Ct. 278], the court said, "We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid.'"

In the instant case the petitioner had no right to the income nor beneficial interest therein. It was obligated to devote it to a

specific designated purpose and the benefit arising from its so doing was that of the City and not of the petitioner.

In United States v. Pickwick Electric Membership Corporation, supra [158 F.2d 276], it is said, "It seems also clear that the taxpayer was not organized for profit. * * * The actual purpose is not controlled by the corporate form or by the commercial aspect of the business transacted, but may be shown by extrinsic evidence, including the by-laws and the method of operation."

The same thought is expressed in the opinion of the Seventh Circuit in Garden Homes Co. v. Commissioner, supra [64 F. 2d 596], where it is said, "We think it is quite obvious from the facts found that petitioner was not organized for profit. It is true that, so far as the statute and the articles of incorporation disclose, the organization might have been one for profit, but the history of the project and the manner in which it was conducted clearly indicate that no profit was contemplated."

In Decatur Water Supply Co. v. Commissioner, supra, where a somewhat similar situation was before the court, it is said [88 F.2d 345], "The company could not and did not profit by its receipt, but in effect it acted as an agency for restoring to the investors the corpus of their investment."

Upon the completion and fulfillment of the conditions of the gift proposal, petitioner and its stockholders became divested of all interest in the property and they received absolutely no profit of any kind. The profit, as has already been observed, was that of the City of Keokuk.

This view is further strengthened by the fact that under the laws of Iowa the acceptance of the gift proposal by the City of Keokuk had the effect of vesting an interest in the bridge property even before the final delivery of the deed. By Section 565.6, 1946 Iowa Code, I.C.A., cities such as Keokuk were authorized to take and hold property by gift and bequest. The statute contains provisions that, "No title shall pass unless accepted by the governing board of the corporation, township, or park board. Conditions attached to such gifts or bequests become binding upon the corporation, township, or park board upon acceptance thereof." Section 383.1 1946 Iowa Code, I.C.A., contains provision that any city is authorized to acquire by purchase or gift, or otherwise, "any existing bridge." The statutes, while recodified in 1946, were in effect for many years prior thereto. The gift of this bridge constituted a charitable gift. Blackford v. Anderson, 226 Iowa 1138, 286 N.W. 735. This being a charitable trust the courts will be guided by substance rather than form. Thus, the Supreme Court of Iowa in Klumpert v. Vrieland, 142 Iowa 434, 121 N.W. 34, 36, announced the rule of construction as follows: "In carrying into effect a legacy to an individual, the mode is deemed to be of the substance of the legacy; but, when the legacy is to charity, the court considers the charity as the substance, and, if the mode prescribed shall fail, will provide another rather than allow the purpose to fail."

This, we think, was a charitable gift to the City of Keokuk and the petitioner was the agency created for the sole purpose of making effectual that gift.

It is to be observed that the gift proposal expressly provided for a forfeiture of the gift and a reverter in the event the bridge should not operate free of tolls, or in the event that another bridge should be constructed within five miles of the existing bridge at any time prior to the discharge of the bonded indebtedness. It is significant that the words "revert" and "revest" are used in this instrument. They indicate that by accepting the proffered gift the City became vested with a present equitable interest. The only condition that might effect a forfeiture before the bonds were retired was that another bridge would be constructed within five miles of the existing bridge. This condition was imposed manifestly for the protection of the bondholders and is in accord with Section 383.12 of the 1946 Iowa Code. I.C.A., which reads as follows: "Neither the state of Iowa nor any political subdivision thereof shall limit or restrict the rights and powers granted in this chapter to the detriment of owners of outstanding bonds authorized hereby, nor

shall such state or political subdivision authorize the construction or itself construct any competing bridge within a distance of less than one mile on either side of any bridge acquired under this chapter unless and until all of such bonds, together with the interest thereon have been fully paid and canceled, unless other adequate provision shall have been made for the protection and guaranty thereof."

The conditions which will postpone the vesting of title are conditions imposed upon the grantee. In the instant case, however, no conditions were imposed upon the City that would effect the forfeiture before the retirement of the bonds. Under the Iowa Gift Statute the acceptance by the City of this gift which imposed no conditions to be performed by it passed title subject to a reverter upon non-performance of the condition. The provisions for defeasance and reverter were operative only during the period of escrow and before the bonds were retired. The Supreme Court of Iowa in Keck v. McKinstry, 206 Iowa 1121, 221 N. W. 851, 855, in construing a deed and declaration of trust which reserved to the grantor the income from the property during his lifetime said, "The equitable estate and interest of the beneficiaries other than the trustor himself were in futuro and defeasible, but they were, notwithstanding, interests created and declared—presently existing, though defeasible."

In Ellsworth College of Iowa Falls v. Emmet County, 156 Iowa 52, 135 N.W. 594, 597, 42 L.R.A.,N.S., 530, the Supreme Court had before it for construction the terms of a will wherein trustees were directed to sell property and after setting aside $25,000 for the purpose of building a home for the aged the balance was to be paid to the trustees of Ellsworth College for the benefit of its endowment fund. While the real estate stood in the name of the trustees and before its sale, the taxing authorities of Emmet County, Iowa, entered it as taxable property. The devise was not to Ellsworth College directly and the taxing authorities took the position that during the years in question it was not exempt to Ellsworth College. The court said, "By the devise in question the trustees were given the legal title to the land, and while the beneficiaries had no interest in the legal or equitable estate expressly devised to the trustees, yet the equitable interest must necessarily have vested in some one. In order to ascertain who the equitable owners are, the court must inquire for whose benefit was the trust created. That being ascertained, the person or persons who are to be the ultimate beneficiaries are regarded in equity as the equitable owners."

It seems clear that under the laws of Iowa the City of Keokuk was from the time of its acceptance of the gift proposal the equitable owner of the bridge property, or at least the owner of an equitable interest therein. The petitioner had no power to revoke or revest and it in fact retained no beneficial ownership in the estate in the absence of a reverter. Petitioner by the terms of the gift proposal and trust indenture was bound to collect the income from the bridge and to apply it to the expense of operation and to the reduction of the bonded debt so that it retained neither beneficial interest in the property nor income. The vital issue is not one of exemption but whether or not the petitioner received taxable income. We conclude that it did not during the years in question receive any income in which it had a beneficial interest.

In view of our conclusion, we pretermit any discussion of the other contentions urged.

The judgment appealed from is therefore reversed and the cause remanded with directions to enter judgment for petitioner consistent with this opinion.

RIDDICK, Circuit Judge, dissenting.

I can not avoid the conclusion that the decision of the Tax Court ought to be affirmed. Whether during the taxable years the City held the equitable or even the legal title to the bridge is not, in my opinion, important. Throughout these years the taxpayer had, to the exclusion of the City and all others, the right to possess, control, and operate the bridge, to receive the income from its operation, and to apply the net income to the payment of its debts. Without the expectation of profit from the posses-

sion and operation of the bridge, the taxpayer would never have been organized. Without the receipt of profit by the taxpayer from the operation and control of the bridge, the plan to transfer title and possession to the City would have failed. To receive and apply for its benefit the net profit from the bridge operation was the purpose for which the taxpayer was organized. The fact that the City eventually comes into full possession and control of the bridge merely shows that the purpose for which taxpayer was created was realized. That the City was an intended and eventual beneficiary of the taxpayer's successful operation does not show that the income earned by the taxpayer during its operation was the income of the City. Other intended and ultimate beneficiaries of the plan were doubtless the stockholders of the original corporation which owned the bridge before its transfer to the taxpayer. For purposes of taxation the taxpayer was the direct and taxable beneficiary of the net income derived from the business it was organized to conduct.